Christopher SCHMIDT, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 29A05–0312–CR–666.

Court of Appeals of Indiana.

Oct. 28, 2004.

---

2. Spencer testified that she observed twenty-four security guards at the Club that evening.

Appellant's App. p. 12.

Bryan L. Cook, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Matthew D. Fisher, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

In May 2002, the State charged Christopher Schmidt with one count of Operating a Vehicle While Intoxicated ("OWI"), as a Class A misdemeanor, and one count of OWI, as a Class C misdemeanor. By separate information, the State charged Schmidt with two counts of OWI, both as Class D felonies, based on a prior OWI conviction. In the first part of Schmidt's bifurcated trial, the jury found him guilty of OWI, as a Class A misdemeanor, and OWI, as a Class C misdemeanor. Schmidt waived his right to a jury trial on the enhancement phase, and the trial court found him guilty of both Class D felony OWI enhancements. The trial court entered judgment of conviction on one count of OWI, as a Class D felony, and sen-

tenced Schmidt to three years, with all but thirty days suspended. The court also imposed two years' probation and ordered that Schmidt's license be suspended for one year. Schmidt now appeals and presents the following issues for review:

1. Whether the trial court abused its discretion when it instructed the jury that if it found that Schmidt had refused to submit to a chemical test, it could consider that refusal as evidence of Schmidt's intoxication.

2. Whether the trial court abused its discretion when it excluded certain expert witness testimony.

3. Whether the trial court abused its discretion when it admitted evidence that Schmidt had refused to submit to a chemical breath test.

4. Whether the State committed prosecutorial misconduct during closing argument.

5. Whether the trial court abused its discretion when it allowed the State to question a defense expert witness about statistics contained in a National Traffic Highway Safety Administration ("NTHSA") manual.

We affirm.

## FACTS AND PROCEDURAL HISTORY

At approximately 6:45 a.m. on May 24, 2002, Carmel Police Officer Michael Pitman observed Schmidt drive his black Lexus through a traffic light that had been red for approximately three seconds. Officer Pitman activated his overhead lights and pursued Schmidt for more than one mile, during which both vehicles reached speeds approaching seventy miles per hour in a fifty mile per hour zone. After the vehicles stopped, Officer Pitman approached Schmidt's vehicle and noticed "a strong odor of alcoholic beverage coming from inside the vehicle." Transcript at

102. The officer also observed that Schmidt's "eyes were kind of red and bloodshot." *Id.* Officer Pitman asked Schmidt for his license and registration. Initially, Schmidt provided the officer with his license and his vehicle insurance card. He later provided his vehicle registration. The officer told Schmidt that he smelled alcohol in the car, and Schmidt stated that he drank alcohol the previous night, but that he had stopped drinking at approximately 11:00 p.m.

Next, Officer Pitman asked Schmidt to exit his car, and Schmidt complied. The officer administered two field sobriety tests, namely, the walk-and-turn test and the one-leg-stand test, both of which Schmidt failed. Officer Pitman then arrested Schmidt and placed him in his police vehicle. En route to the Hamilton County Jail, Officer Pitman read to Schmidt Indiana's implied consent law, which the officer had printed on a card. Specifically, the officer stated to Schmidt: "I have probable cause to believe that you have operated a vehicle while intoxicated. I must now offer you the opportunity to submit to a chemical test. Will you take a chemical test?" *Id.* at 115. The officer also explained to Schmidt that his refusal to submit to a test would result in his license being suspended for one year. Schmidt refused to take a chemical test.

The State charged Schmidt with two counts of OWI, and then two counts of OWI as an enhancement. On the first day of trial, the trial court granted portions of the State's Motion in Limine regarding particular testimony from Dr. Daniel McCoy, one of Schmidt's expert witnesses. During his offer of proof, Schmidt explained that Dr. McCoy, a toxicologist, would have testified in relevant part that given various factors like Schmidt's height, weight, and the amount of alcohol he had consumed on the night before his arrest,

Schmidt's blood alcohol content would have been below the legal limit. The court also granted the portion of the State's motion that sought to exclude certain witnesses from testifying about Schmidt's medical history.

The State presented testimony from Officer Pitman and Fred Ilnicki, a sergeant with the Indianapolis Police Department who had watched the videotape of Schmidt performing the field sobriety tests, to prove that Schmidt was intoxicated on the morning in question. Schmidt presented one witness at trial, William Bennett, a private investigator and former law enforcement officer who is certified by the NTHSA to conduct field sobriety tests. Like Sergeant Ilnicki, Bennett had also watched the videotape of Schmidt performing the field sobriety tests. In Bennett's opinion, Schmidt did not fail those tests. During his testimony, Bennett frequently referred to guidelines and procedures in an NTHSA manual. On cross-examination, the State asked Bennett, over Schmidt's objection, about particular statistics published in that NTHSA manual regarding field sobriety tests. The trial court did not allow Bennett to testify about Schmidt's medical conditions or give an opinion on whether those conditions affected his performance during the field sobriety tests. At the conclusion of Bennett's testimony, Schmidt made his offer of proof regarding Dr. McCoy's testimony.

During closing argument, the State commented in relevant part that Officer Pit-

man's testimony was the "sole testimony" the jury had to consider regarding Schmidt's driving on the morning of May 24, 2002. *Id.* at 316. Schmidt's counsel did not object to the statement, and the jury found Schmidt guilty as charged. Schmidt now appeals.

## DISCUSSION AND DECISION

### Issue One: Jury Instructions

■ First, Schmidt asserts that the trial court abused its discretion when it instructed the jury in relevant part as follows:

### COURT'S FINAL INSTRUCTION NO. 9

If you find that the Defendant refused to submit to a chemical test, after being advised of the consequences, you may consider the refusal as evidence of intoxication.

Appellant's App. at 40.[1] Schmidt contends that that instruction is improper because it emphasizes particular evidence, namely, his refusal to submit to a chemical breath test.

■ Instruction of the jury is left to the sound judgment of the trial court and will not be disturbed absent an abuse of discretion. *Stoltmann v. State,* 793 N.E.2d 275, 279 (Ind.Ct.App.2003) (quotations omitted), *trans. denied.* Jury instructions are not to be considered in isolation, but as a whole and in reference to each other. *Id.* at 279–80. The instruc-

---

1. Schmidt also directs us to the Court's Final Instruction No. 8, which provides:

 A person who operates a vehicle impliedly consents to submit to a chemical test as a condition of operating a vehicle in Indiana. A law enforcement officer who has probable cause to believe that a person has committed an offense of Operating While Intoxicated shall offer the person the opportunity to submit to a chemical test.

 A person must submit to each chemical test offered by a law enforcement officer in order to comply with the implied provisions of this statute.

 But independent from Instruction No. 9, Schmidt does not explain why that instruction is erroneous. Accordingly, we address only his argument that Instruction No. 9 is improper.

tions must be a complete, accurate statement of the law which will not confuse or mislead the jury. *Id.* at 280 (quotations omitted).

Whether it is proper to instruct a jury that a defendant's refusal to submit to a breath test may be considered as evidence of either guilt or intoxication is a question currently being debated among members of this court. For example, in *Luckhart v. State*, 780 N.E.2d 1165, 1168 (Ind.Ct.App. 2003), the trial court instructed the jury that "[t]he defendant's refusal to submit to a chemical test for intoxication may be considered as evidence of Defendant's guilt of driving while intoxicated." (Brackets original). The panel in that case relied on *Hurt v. State*, 553 N.E.2d 1243, 1249 (Ind. Ct.App.1990), which involved a challenge to a similar instruction, to conclude that the instruction was neither confusing nor misleading. *Id.* Specifically, the panel in *Luckhart* stated:

> In this case, as in *Hurt*, the trial court's instructions repeatedly referenced the issue of Luckhart's guilt, and expressly set forth the elements that had to be proved to establish Luckhart's guilt. *It might have been more accurate for the trial court to have instructed the jury that Luckhart's refusal to take a chemical breath test was evidence of his intoxication rather than evidence of his guilt of the offense of driving while intoxicated, as there is no connection between his refusal to take the test and his operation of a vehicle.* Nevertheless, there was no dispute that Luckhart had been driving when he refused to take the test, and it is not likely that the jury was confused about the proper element of the offense to which the evidence pertained. Accordingly, the trial court did not abuse its discretion by giving the instruction.

*Id.* at 1168–69 (emphasis added).

Approximately ten months after *Luckhart*, another panel of this court decided *Stoltmann*. In that case, as in *Luckhart*, the trial court instructed the jury that "[a] defendant's refusal to submit to a chemical test may be considered as evidence of the defendant's guilt." 793 N.E.2d at 280. Although the panel in *Stoltmann* acknowledged the decisions in *Hurt* and *Luckhart*, that panel nevertheless concluded that the instruction was improper. Specifically, the panel explained:

> While Stoltmann's refusal to take a chemical breath test was admissible into evidence, *see* Ind.Code § 9–30–6–3(b), the challenged instruction unduly emphasizes its importance. Furthermore, the instruction confuses and misleads the jury by permitting it to infer that the refusal is sufficient to establish all the elements of the offense of operating a vehicle while intoxicated, when, at best, it establishes only that he refused to take the test.
>
> Our supreme court recently disapproved the use of an analogous instruction. In [*Dill v. State*, 741 N.E.2d 1230, 1231–32 (Ind.2001)], the court found that the trial court erred in instructing the jury that "it could consider the flight of a person after the commission of a crime" as evidence of guilt. [citation omitted]. The *Dill* court determined that the instruction was confusing and misleading and unduly emphasized specific evidence. *Id.* at 1233. For similar reasons, we conclude that the trial court abused its discretion in instructing the jury regarding Stoltmann's refusal to submit to the chemical breath test.

*Id.* at 280–81.

More recently, another majority opinion of this court agreed with the outcome in *Stoltmann*, but applied the reasoning in that case to a jury instruction almost identical to the instruction at issue here. *See Ham v. State*, 810 N.E.2d 1150, 1152 (Ind.

Ct.App.2004), *trans. granted.* The defendant in *Ham* argued that the trial court erred when it instructed the jury that "a defendant's refusal to submit to a chemical test may be considered as evidence of intoxication." The majority agreed and explained in relevant part:

> While at least two panels of this court have tacitly approved the giving of the instruction that the trial court tendered in this case, we decline to follow the trail that has been blazed by those several colleagues. That is, we disagree with the notion that it is proper to instruct that the refusal to take the test is evidence of either intoxication *or* guilt. It is our view that the instruction has the high potential of misleading or confusing the jury.

> We acknowledge that Indiana Code [S]ection 9–30–6–3(b) does permit a defendant's refusal to submit to a chemical test to be admitted into evidence. However, it is apparent that such evidence is probative only to explain to the jury why there were no chemical test results. We again emphasize that the defendant's refusal to submit to the test is simply *not* probative of his guilt or intoxication, and we fail to see any nexus between a defendant's right to refuse a chemical test for intoxication and the fact that he might be in such a condition. Put another way, an instruction given to the jury like the one here bears no relationship upon the determination as to whether a defendant may be intoxicated. At best, the admission of such evidence only establishes that the defendant refused to take the test.

*Id.* at 1154 (emphasis original).

As in *Stoltmann,* the majority opinion in *Ham* also found our supreme court's decision in *Dill* instructive. And in determining that the instruction had "a significant potential to mislead the jury[,]" the majority in *Ham* stated further:

> The instruction ... emphasizes Ham's decision to decline a chemical test and tells the jury to assign that same decision as evidence of intoxication. To be sure, intoxication is a necessary element that must be proven by the State beyond a reasonable doubt in a charge of operating a vehicle while intoxicated. Permitting an instruction that leads the jury to believe the burden has been met [by evidence of a refusal] simply cannot be permitted.

*Id.* at 1154–55 (citation omitted); *but see id.* at 1158–59 (Bailey, J., dissenting in part) (concluding instruction does not place undue emphasis on certain evidence).

On September 8, 2004, our supreme court granted transfer in *Ham* and, thus, that opinion has been vacated. Nevertheless, we hold that an instruction which informs the jury that it may consider evidence that the defendant refused to submit to a chemical breath test as evidence of intoxication is improper. Regardless of whether it is reasonable to infer guilt or intoxication from a defendant's refusal to submit to a chemical breath test, the instruction unnecessarily emphasizes one particular evidentiary fact, namely, Schmidt's refusal to submit to a breath test. *See Dill,* 741 N.E.2d at 1232 ("[A]lthough evidence of flight may, under appropriate circumstances, be relevant, admissible, and a proper subject for counsel's closing argument, it does not follow that a trial court should give a discrete instruction highlighting such evidence. To the contrary, instructions that unnecessarily emphasize one particular evidentiary fact, witness, or phase of the case have long been disapproved."). In addition, the instruction is misleading to the extent that it suggests that Schmidt's refusal alone is

sufficient to establish the element of intoxication.

Moreover, since *Dill*, our supreme court has held that it is error to instruct a jury that "[a] conviction may be based solely on the uncorroborated testimony of the alleged victim if such testimony establishes each element of any crime beyond a reasonable doubt." *Ludy v. State*, 784 N.E.2d 459, 460 (Ind.2003). Similar to the decision in *Dill*, the court in *Ludy* concluded in part that that instruction was improper because it unfairly focused the jury's attention on particular evidence and was misleading and confusing to the jury. *See id.* at 461. The instruction at issue in this case suffers from the same defects. Thus, we agree with Schmidt that the trial court erred when it gave Instruction No. 9.

■ Still, errors in the giving or refusing of instructions are harmless where a conviction is clearly sustained by the evidence and the jury could not properly have found otherwise. *Dill*, 741 N.E.2d at 1233. An instruction error will result in reversal when the reviewing court "cannot say with complete confidence" that a reasonable jury would have rendered a guilty verdict had the instruction not been given. *Id.* (quoting *White v. State*, 675 N.E.2d 345, 349 (Ind.Ct.App.1996)).

In this case, Officer Pitman testified that on the morning in question, he was sitting in his police vehicle in the westbound lane waiting for a green traffic light at the intersection of 126th Street and Keystone Avenue. After the light had turned green for the westbound traffic, he observed Schmidt speed through the southbound lane after the traffic light for that lane had been red for "a good three seconds[.]" Transcript at 96. The officer then activated his overhead lights and pursued Schmidt's vehicle for more than one mile while traveling approximately seventy miles per hour in a fifty-mile-per-hour zone.

After Schmidt stopped and Officer Pitman approached his vehicle, the officer asked for Schmidt's license and registration. Schmidt initially provided the officer with his driver's license and his insurance card. Officer Pitman, again, asked Schmidt for his registration, which he provided. Officer Pitman smelled a strong odor of an alcoholic beverage from inside the vehicle. He also observed that Schmidt's eyes were red and bloodshot.

Next, the officer informed Schmidt that he smelled alcohol and asked if he had been drinking. Schmidt told Officer Pitman that he had been drinking, but he claimed that he had stopped drinking around 11:00 p.m. the night before. Thereafter, Officer Pitman administered, and Schmidt failed, two field sobriety tests. In particular, while performing the walk-and-turn test, Schmidt stopped after he walked heel-to-toe for nine steps, looked at the officer and put both feet on the ground instead of turning and walking back another nine steps as instructed. And on the one-leg-stand test, Officer Pitman testified that Schmidt had to put his foot down after approximately thirteen seconds and that he was unable to stand on one foot without swaying. In addition, Schmidt failed to look at his toe and keep his arms to his sides while he performed the test as the officer had instructed him to do. As the officer administered the tests, Schmidt also told him that based on what he drank and the time at which he claimed he had stopped drinking, he thought he "was probably right at [the legal] limit." *Id.* at 111.

As the State points out, the jury viewed the videotape of Officer Pitman administering the field sobriety tests and was able to weigh that evidence in deciding whether Schmidt was intoxicated. Further, Officer

Pitman testified that, based on his training and experience, he believed that Schmidt was intoxicated on the morning in question. Sergeant Ilnicki also watched the videotape of Schmidt performing the field sobriety tests and corroborated Officer Pitman's testimony that Schmidt had failed both tests.

In light of Schmidt's erratic driving, his admission that he had consumed alcohol in the recent past, his failure of two field sobriety tests, and Officer Pitman's observations at the scene, we are confident that a reasonable jury would have rendered a guilty verdict even if the trial court had not given the erroneous instruction. *See Stoltmann*, 793 N.E.2d at 281 (concluding improper instruction was harmless error where defendant admitted to officer that she had been driving and was intoxicated). And Indiana Trial Rule 61 provides that, at every stage of the proceeding, the court must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties. Therefore, while the trial court erred when it gave Instruction No. 9, that error did not affect Schmidt's substantial rights and was harmless.

## Issue Two: Exclusion of Expert Testimony

Prior to trial, the State filed a motion in limine, which provided in relevant part as follows:

2) The Defendant has indicated that he is going to call Dr. McCoy as a witness in this case. Dr. McCoy should be barred from testifying about the level of intoxication of the Defendant or any hypotheticals unless and until the proper facts are in evidence that would allow him to form an opinion as to such. Dr. McCoy should be barred from testifying as to the amount of alcohol the Defendant had consumed, when he consumed it, how much he weighs, and when he last ate.

\* \* \*

6) Counsel for the Defendant has presented the State with one page from the Defendant's medical record indicating that he had, at some point, an ear problem. Counsel for the Defendant has informed the State that he does not intend to call the treating physician who diagnosed the condition. The State believes that the Defendant's medical condition will lack proper foundation and relevancy to be admitted into evidence. Therefore, the State requests that the Court order that there be no mention of the defendant's supposed ear problem until such is entered into evidence. Allowing it to be addressed beforehand would result in undue prejudice to the State.

Appellant's App. at 23. The trial court granted the State's request regarding paragraph two and granted the request regarding paragraph six "as to medical diagnosis." *Id.*

On the first day of trial, during a bench conference regarding paragraph two of the State's motion, the following transpired:

[State]: All [paragraph] 2 is seeking to do is prevent Dr. McCoy from testifying as to what the Defendant may or may not have told him outside of court to form an opinion as to what his BAC level was. If those facts come in before Dr. McCoy testifies, then the State doesn't have any problem with that.

[Defense]: Well, Judge, Dr. McCoy is entitled to gain information from a Defendant. He's entitled for a Defendant to say, hey, this is my weight, this is my height, or any other source and render an opinion on that.

The Court: Is that not an opinion based on facts not in evidence?

[Defense]: Well, as long as it's reasonably relied upon by experts in the field, and that goes to 703. A Defendant cannot testify and can tell Dr. McCoy, "Look, I drank . . ."

The Court: Doesn't 703 cover other experts' testimony?

[Defense]: Experts may testify—703—experts may testify to opinions based on inadmissible evidence. Now, I guess I'm getting a little bit ahead of myself because the videotape shows that the Defendant, the officer asked the defendant, "Hey, how much have you had to drink[?] When did you stop drinking?" And it's going to be apparent, I don't know that height and weight are going to be much of an issue here with regard to the Defendant. I don't know how that could be inadmissible. Hey, you know, the Defendant is six feet tall, 220 pounds.

[State]: Your Honor, if that's going to come in through the videotape then, that's fine. That's not what's addressed in paragraph 2. What's addressed is whether or not Dr. McCoy can testify to it. Your Honor, I would point the Court to[,] in the explanation of the Rules of Evidence, it specifically says Rule 703 authorizes admission of otherwise inadmissible evidence on which a testifying expert has relied. The otherwise inadmissible evidence may be considered only in evaluating the expert's opinion and not as substantive evidence. I think that's trying to get in substantive evidence as to how much he drank, when he drank it, what kind of wine it was, what level of alcohol was in the wine.

[Defense]: Well, 705 even says an expert can get on the stand and say, "Hey, I have an opinion. Here's what it is." He doesn't even have to say the underlying facts unless the State wants to get into [it] on cross-examination, which I think is interesting.

The Court: Well, I don't think 703 covers an expert witness relying on facts from a criminal defendant and if the criminal defendant is not going to testify, *I don't think that's fair to have an expert really testify on behalf of the Defendant as to what he weighs, what he ate, what he drank, whether he has a hearing problem[,] unless those facts are in evidence. I'm going to grant paragraph 2. I think it's a proper objection and I don't think 703 is intended to cover testimony of a party. I think it's intended to cover expert witnesses or other reports by other experts an expert may rely on.* For example, if Dr. McCoy had access to the Defendant's medical records and reviewed the medical records, he may rely on those. But that's, whether or not he did that—

Transcript at 16–18 (emphasis added). The court further clarified that it had granted paragraph six of the State's motion "as to any medical diagnosis [Schmidt] may have received from a doctor." *Id.* at 19.

Later during the trial, Schmidt called Bennett as an expert witness and wanted him to give an opinion based on a one-page medical record, which established that Schmidt has suffered from unilateral deafness and vertigo. The State objected, and the trial court sustained that objection. During his offer of proof, Schmidt's counsel explained that Bennett would have testified that Officer Pitman should not have administered the field sobriety tests while Schmidt suffered from those conditions. He stated further that Bennett would have testified that Schmidt's hearing loss and vertigo could explain the balance problems

he had while performing the field sobriety tests.

Schmidt's counsel then made a similar offer of proof regarding Dr. McCoy. Specifically, Schmidt proffered two exhibits as part of his offer of proof, namely, Dr. McCoy's curriculum vitae and Schmidt's one-page medical record. The State pointed out that the trial court's previous ruling on its motion in limine did not prevent Dr. McCoy from testifying entirely. Thereafter, the following transpired:

[Defense]: There's no use to call him to testify if he can't testify as to the area in question. The order in limine specifically says that he can't testify—let's see here—number 2. We have number 2 and number 6. Number 2 deals with the level of intoxication. Now, unless and until the proper facts are in evidence to allow him to form an opinion. Well, an expert such as Dr. McCoy if called would say it's reasonably relied upon in his area of expertise, and I would proffer Defendant's Exhibit B ... to show Dr. McCoy's expertise, that he listens to a Defendant, but most of the time the Defendant doesn't testify and gives [an] opinion based upon what the Defendant tells him about his weight, his height, what time he started drinking, 6:00 p.m. and completed at 11:00 p.m. the night before this incident, and based on that the BAC, the actual BAC would be anywhere [between] .00 to .04. And that would be—

[State]: About depending on how much he had to drink.

[Defense]: Well, yeah, he would know because the Defendant would tell him and it's something under 703 would be appropriate because it's the type of evidence that's reasonably relied upon by experts, by experts in his field.

[State]: Your Honor, he's using an offer to prove to try to—it's hearsay evidence.

\* \* \*

[Defense]: And I would also mark Defendant's Exhibit C ... as an offer to prove as a medical record relied upon by the, it would have been relied upon by Dr. McCoy to establish that Chris did get treatment for or was diagnosed with a substantial hearing loss and vertigo, that he still had this, was still suffering from the effects of this during the incident. And that would be admissible to show an explanation for balance issues.... And Chris is making a choice to exercise [his right] not to testify and he's forced to choose between presenting evidence, his right to present evidence and have a fair trial and his right not to testify.

The Court: So this offer to prove is based on evidence that you feel Dr. McCoy would testify to but he was not called as a witness because of the Court's ruling on the Motion in Limine would prevent his testimony. Is that right?

[Defense]: That's correct....

The Court: After considering the offers to prove, the Court does not wish to change its previous rulings. If there is simply some evidence that the Defendant wishes to present, the Defendant will have to testify, but the Defendant can't get in through other evidence[ ] and avoid testifying. It's just that's the way the rule is. Do you have any additional witnesses, [defense counsel], or have you completed?

Transcript at 300–02.

On appeal, Schmidt maintains that the trial court abused its discretion when it excluded the expert testimony of both Dr.

McCoy and Bennett under Indiana Evidence Rule 703. Specifically, he asserts that Dr. McCoy should have been allowed to give an opinion regarding Schmidt's level of intoxication because expert witnesses may base their testimony on information reasonably relied upon by experts in the field in question. He argues further that the trial court's ruling on Dr. McCoy's testimony forced him to choose between his right to remain silent and his right to present a defense. He also claims that both Dr. McCoy and Bennett should have been allowed to give opinions about whether the officer should have administered field sobriety tests on Schmidt based on information contained in the one-page medical record.

■ A trial court is accorded discretion in ruling on the relevancy and admissibility of expert testimony. *Carnahan v. State*, 681 N.E.2d 1164, 1166 (Ind.Ct.App.1997). We will not reverse a trial court's decision absent an abuse of discretion, that is, where the decision is clearly against the logic and effect of the facts and circumstances before it. *Id.*

### A. Dr. McCoy

■ The first question presented is whether the trial court erred when it prohibited Dr. McCoy from giving an opinion based on information he had received from Schmidt prior to trial when Schmidt had not testified and placed those facts into evidence. Indiana Rule of Evidence 703 provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. Experts may testify to opinions based on inadmissible evidence, provided that it is of the type reasonably relied upon by experts in the field.

Judge Robert Miller has explained that rule in relevant part as follows:

> Rule 701 requires that opinion testimony be based on the witness's personal perception. Rule 703 eliminates that requirement for witnesses offering expert testimony within the meaning of Rule 702. Rule 703 allows an expert witness to base an opinion on (i) facts perceived by the witness, (ii) facts made known to the witness at the hearing in which the testimony is offered, or, (iii) within limits, facts or data made known to the expert before the hearing. The rule establishes no preference among these methods, and an expert may, consistent with Rule 703, rely on a combination of the methods.

13 ROBERT LOWELL MILLER, JR., INDIANA PRACTICE, INDIANA EVIDENCE § 703.101, 411–12 (2d ed.1995) (footnotes omitted). Regarding opinions based on facts or data made known to the expert before the hearing, Judge Miller writes:

> *Until the 1960s, the common law limited expert opinion to that which was based on personal knowledge or hypothetical question, and excluded expert opinion testimony that was based upon information received from third parties.* This traditional rule is consistent with the theory underlying the admission of expert testimony: if the trier of fact finds the facts to be as the expert witness testifies or assumes them to be, expert opinion based on those facts may assist the trier of fact. A jury that never learns of the facts supporting the opinion will have no way to determine whether the facts it finds to be true are those presumed by the expert and hence will be unable to evaluate the expert's opinion.
>
> In the conduct of regular affairs, however, many persons who testify as expert witnesses customarily rely upon infor-

mation received from others. For example, one seeking treatment from a physician would hardly demand that the physician exclude from consideration radiologists' reports concerning X-rays, records of past hospital admissions and treatment by other physicians, or nurses' reports concerning blood pressure and vital statistics. Instead, the physician is expected to assimilate and evaluate every available source of information in arriving at a diagnosis or prescription for treatment.

In recognition of this reality of life beyond the pale of the law of evidence, *Rule 703 allows an expert witness to base an opinion on information received from others before trial, if the information is of a sort that other experts in the field reasonably [rely] upon.*

*Id.* at § 703.106, 422–23 (footnotes omitted, emphases added). Thus, under some circumstances, Rule 703 allows an expert witness to testify to opinions based on facts not before the jury. *See id.* at § 703.109, 434–35 ("While Rule 703 allows an expert to testify to opinions based on material not before the jury, it does not expressly provide a vehicle by which the jury can learn of the underlying material and so decide how much or little weight to afford the opinion"); Ind. Evid. Rule 705 (allows expert witness to testify to opinion without first testifying to underlying facts, unless court requires otherwise, and provides expert may nevertheless be required to disclose underlying facts on cross-examination).[2]

Again, Schmidt asserts that Dr. McCoy's opinions are admissible under the rule because his expert testimony would have been based on inadmissible facts that are "of the type reasonably relied upon by experts in the field." *See* Evid. R. 703.[3] In its initial ruling on the State's motion in limine, the trial court determined that statements by a defendant did not fall within the purview of the types of information or data contemplated by Rule 703. We agree. Again, we find Judge Miller's commentary instructive:

[E]arlier Indiana cases, and other courts governed by Rule 703, generally have found the following sorts of information to be reasonably relied upon by experts in various fields: hospital records, laboratory reports, X-rays, and doctors' medical records relied on by medical professionals; reports by subordinates relied upon by superiors; discussions with other experts in the expert's field; mental hospital records reports by clinical psychologists and social workers, and police reports relied upon by psychiatrists or forensic psychologists; a report

2. In its motion in limine, the State sought to bar Dr. McCoy, in part, from answering any hypothetical questions unless and until the facts underlying those questions were in evidence. An expert witness may express his opinion regarding a hypothetical question if the following foundational prerequisites are satisfied: (1) the expert's ability to give such an opinion must be established through testimony showing he has the requisite knowledge, skill, education, or experience on which to base the opinion; and (2) there must be a proper evidentiary foundation supporting the facts that are included in the hypothetical question. *Johnson v. State,* 699 N.E.2d 746, 750 (Ind.Ct.App.1998). Thus, had Schmidt intended to elicit Dr. McCoy's opinion regarding his level of intoxication through hypothetical questions, we agree with the State that the facts included in the hypothetical questions would have had to have been admitted into evidence.

3. Schmidt's statements to Dr. McCoy are inadmissible hearsay because such statements are not statements by a party-opponent under Indiana Evidence Rule 801(d)(2). Specifically, the statements were not offered against Schmidt. Rather, Schmidt sought to offer statements he had made to Dr. McCoy through Dr. McCoy's testimony.

from an engineering firm relied upon by an engineer; an autopsy report relied upon by a pathologist; business records relied upon by an expert in the business field; and state agency records relied upon by a law enforcement officer.

*Courts have shown considerable reluctance to find reasonable reliance on information not prepared by persons with specialized training, such as* lay witness statements, anonymous reports, *statements by a party,* and data prepared in anticipation of litigation.

13 ROBERT LOWELL MILLER, JR., INDIANA PRACTICE, INDIANA EVIDENCE § 703.107, 427–30 (footnotes omitted, emphases added). Additionally, "the rule allowing an expert's reliance on hearsay cannot be employed simply as a conduit for placing ... another person's statement before the jury." *Id.* at § 703.109, 437.

Indeed, this court has addressed an evidentiary dispute similar to the issue that Schmidt raises here. Specifically, in *Weaver v. State*, 627 N.E.2d 1311, 1315 (Ind.Ct.App.1994), *summarily aff'd in relevant part and vacated in part on other grounds*, 643 N.E.2d 342 (Ind.1994), we held that a trial court properly precluded testimony from an expert witness "regarding ... information [the witness had] received from [the defendant prior to trial] *until that evidence was placed on the record by [the defendant's] own testimony.*" (Emphasis added). In that case, the defendant's expert witness, a toxicologist, testified that, in his opinion, the defendant was suffering from a "bad trip" or an "acute psychotic reaction" to LSD on the night the defendant attacked the victim. *Id.* at 1315. The expert witness based his opinion on two interviews he had with the defendant prior to trial and a hospital report which confirmed that the defendant had LSD in his system on the night of his arrest. *Id.* We concluded that without the

defendant's "foundational testimony" at trial, the expert witness's testimony "would serve as a conduit for [the defendant's] 'story' without affording the State the opportunity to challenge the veracity and accuracy of that story by cross-examining [the defendant]." *Id.* We therefore affirmed the trial court's decision to preclude the expert testimony regarding the information he had received from the defendant until the defendant had testified.

Although the defendant's criminal trial in *Weaver* occurred before our Rules of Evidence went into effect, the decision in that case is consistent with the types of information courts generally have found to be reasonably relied upon by experts in various fields under Rule 703. *See* 13 ROBERT LOWELL MILLER, JR., INDIANA PRACTICE, INDIANA EVIDENCE § 703.107, 429–30 (stating courts have been reluctant to find reasonable reliance under Rule 703 on information not prepared by persons with specialized training, such as statements by a party) (footnotes omitted, emphases added). As in *Weaver*, Dr. McCoy's opinion regarding Schmidt's level of intoxication was based on information Schmidt had told him before trial. In other words, statements by the defendant were the basis of Dr. McCoy's opinion. He did not rely on records, data, reports, or other types of information our courts have generally found to be reasonably relied upon by experts in a particular field. *See* 13 ROBERT LOWELL MILLER, JR., INDIANA PRACTICE, INDIANA EVIDENCE § 703.107, 427–30. To allow Schmidt to present his version of events through Dr. McCoy's testimony would be "a conduit for placing ... another person's statement before the jury." *Id.* at § 703.109, 437. Therefore, we conclude that the trial court did not abuse its discretion when it excluded Dr. McCoy's testimony unless and until Schmidt testi-

fied.[4]

### B. Opinions Based on Medical Record

 Next, Schmidt asserts that the trial court erred when it ruled that neither Dr. McCoy nor Bennett could give opinions based on Schmidt's one-page medical record. As we have stated, Schmidt wanted both witnesses to testify that Schmidt had suffered from hearing loss and vertigo, which may have affected his performance on the field sobriety tests. He also wanted Bennett to testify that Officer Pitman should not have administered field sobriety tests given Schmidt's medical conditions.

As this court stated in *Faulkner v. Markkay of Indiana, Inc.*, 663 N.E.2d 798, 800 (Ind.Ct.App.1996), *trans. denied:*

> [Indiana] Evidence Rule 703 states, "[e]xperts may testify to opinions based on inadmissible evidence, provided that it is of the type reasonably relied upon by experts in the field." [Evidence Rule] 702 permits the admission of expert opinion *testimony* not opinions contained in documents prepared out of court by medical doctors. [Evidence Rule] 703 allows a testifying expert to rely on materials, including inadmissible hearsay, in forming the basis of his opinion. Moreover, this court has held that an expert may *offer his opinion* based in part upon hearsay, provided (1) the ex-

pert has sufficient expertise to evaluate the accuracy and reliability of the information, (2) the report is of the type normally found reliable, and (3) the information is the type customarily relied upon by the expert in the practice of his profession.

(Citations omitted, emphasis original).

*Faulkner* involved a plaintiff who slipped and fell in a grocery store and then sued to recover for her injuries. The plaintiff wanted a chiropractor, Dr. Sprinkle, to testify regarding out-of-court statements made by physicians that were contained in medical reports. *See id.* The trial court excluded Dr. Sprinkle's testimony on the basis that he was not a physician and was not capable of being cross-examined with respect to the information contained in the physician's reports. *Id.* We agreed and stated as follows:

> The evidence rules do not permit the admission of materials, relied upon by an expert witness, for the truth of the matters they contain if the materials are otherwise inadmissible. Here, the materials were otherwise inadmissible because Dr. Sprinkle, a doctor of chiropractic, does not have the same education, training or experience as the physicians who prepared the reports.

---

4. Schmidt suggests that Dr. McCoy could have also based his opinion regarding Schmidt's level of intoxication on the statements Schmidt made to Officer Pitman during the traffic stop, which the jury heard when the State played the videotape of the stop. But the State conceded at trial that it would have no objection to Dr. McCoy's opinion testimony *if* all of the relevant information on which he would base his opinion was admitted into evidence through the videotape. Schmidt did not choose to call Dr. McCoy and have him give an opinion based on only that information which appeared in the videotape. Nor did Schmidt attempt to call some other witness who might have been able to testify regarding the facts on which Dr. McCoy

based his opinion. For example, if Schmidt made statements on the videotape regarding how much he had had to drink and when he had stopped drinking, he could have called his physician or some other witness to testify regarding his current height and weight. With those facts in evidence, Dr. McCoy could have based his opinion, or answered hypothetical questions, on facts already in evidence. In light of those circumstances, we disagree with Schmidt's assertion that the trial court's ruling *forced* him to choose between his constitutional right to remain silent and his right to present a defense. In short, Schmidt's testimony was not the only way for him to submit into evidence the facts on which Dr. McCoy based his opinion.

We cannot allow an expert's reliance on hearsay to be employed as a conduit for placing the physicians' statements before the jury. The expert witness must rely on his own expertise in reaching his opinion and may not simply repeat opinions of others.

Furthermore, this court has concluded that chiropractors are generally not qualified to serve as experts in cases involving physicians. They do not have the same education, training or experience, all of which are generally necessary to render an opinion of benefit to a jury.

*Id.* at 801 (citations and footnote omitted). And as Judge Miller has noted:

Like Indiana's common law rule, Rule 703 is based on the assumption that truly qualified experts are capable of evaluating information of a sort normally relied on by others in their field. *Rule 702 would seem to provide ample discretion to distinguish between an expert qualified to evaluate the reports and opinions of others and an expert whose testimony would assist if based on his own observations or calculations, but who lacks the specialized knowledge required to evaluate information from others.*

13 ROBERT LOWELL MILLER, JR., INDIANA PRACTICE, INDIANA EVIDENCE, § 703.108, 433–34 (footnotes omitted, emphasis added).

Here, neither Dr. McCoy nor Bennett is a medical doctor. Dr. McCoy has a Ph.D., with a major in toxicology and a minor in pharmacology, and Bennett is an expert in field sobriety tests. In other words, neither Dr. McCoy nor Bennett has the same education, training, or expertise as the physician who prepared the one-page medical record. Yet, Schmidt wanted both of them to give opinions that the medical diagnoses contained in the one-page medical record affected his ability to perform the field sobriety tests. In so doing, both witnesses would have had to preface their opinions with some statement that Schmidt had been diagnosed in the past with unilateral deafness and vertigo, which is precisely what we determined the chiropractor in *Faulkner* could not do, namely, "testify regarding out-of-court statements made by physicians in medical reports." *Faulkner*, 663 N.E.2d at 800. Indeed, following our reasoning in *Faulkner*, the diagnoses contained in the one-page medical record regarding Schmidt's history of unilateral deafness and vertigo constitute "otherwise inadmissible hearsay," and we cannot allow Dr. McCoy's and Bennett's "reliance on that hearsay to be employed as a conduit for placing the [physician's] statements before the jury." *Id.* at 801. Put another way, as in *Faulkner*, if Dr. McCoy and Bennett had been allowed to testify based on the one-page medical record, neither was capable of being cross-examined with respect the medical diagnoses contained in the one-page record, and Schmidt would have been permitted to place his medical history into evidence without having his diagnoses challenged on cross-examination. We conclude that the trial court did not abuse its discretion when it excluded opinions from those witnesses regarding Schmidt's medical diagnoses and whether his diagnosed medical conditions affected his performance on field sobriety tests.[5]

---

**5.** The dissent's suggestion that in ruling on the State's motion in limine, the trial court "indicated that Dr. McCoy could rely upon that medical record in forming his own opinion as to what effect, if any that ear condition would have upon Schmidt's failure of the sobriety tests[ ]" is not supported by the record. During the pre-trial conference on the State's motion in limine, the trial court had before it two distinct evidentiary issues regarding Dr. McCoy's testimony: (1) whether Dr. McCoy could testify based on facts

### Issue Three: Admissibility of Schmidt's Refusal

Schmidt contends that the trial court abused its discretion when it admitted evidence that Schmidt had refused to submit to a chemical breath test. Specifically, he asserts that because he was in custody when Officer Pitman asked him to consent to a breath test, the officer was required to advise him of his right to consult with counsel under *Pirtle v. State*, 263 Ind. 16, 323 N.E.2d 634 (1975), and *Sims v. State*, 274 Ind. 495, 413 N.E.2d 556 (1980). The State responds in part that chemical breath tests are not governed by the *Pirtle* doctrine. We agree with the State.

"*Pirtle* and *Sims* stand for the proposition that, under the Indiana Constitution, 'a person in custody must be informed of the right to consult with counsel about the possibility of consenting to a search before a valid consent can be given.'" *Torres v. State*, 673 N.E.2d 472, 474 (Ind.1996). Evidence obtained in violation of the *Pirtle* doctrine is not admissible at trial. *See id.* (holding evidence seized following invalid consent to search was improperly admitted at trial).

In *Ackerman v. State*, 774 N.E.2d 970, 982 (Ind.Ct.App.2002), *trans. denied*, we held that police are not required to advise a person in custody that he may consult with an attorney before administering field sobriety tests and, thus, that field sobriety tests are not governed by *Pirtle*. In that case, we explained in relevant part as follows:

In *Pirtle*, police already suspected Pirtle's involvement in a murder when they arrested him on an unrelated charge, but had no evidence linking him to the murder. Police had already had Pirtle in custody for twelve hours and had repeatedly violated his *Miranda* rights when they asked for and received his consent to an unlimited search of his apartment. Upon searching Pirtle's apartment, the police found inculpatory evidence that led to his arrest and conviction for murder.

The *Pirtle* court noted that the "decision to consent to an *unlimited search* is a vital stage in the prosecutorial process." The *Pirtle* court also noted the many protections of one's right against unreasonable searches and seizures that are waived when one consents to a search requiring probable cause[.]

Schmidt had told him before trial; and (2) whether Dr. McCoy could testify regarding medical diagnoses contained in a one-page medical record. Those two issues were contained in paragraphs two and six, respectively, of the State's motion. As we have already noted, in ruling on paragraph two, i.e., whether Dr. McCoy could testify based on statements made by Schmidt, the trial court concluded that Rule 703 was not intended to "cover testimony of a party." Transcript at 18. The court then stated: "For example, if Dr. McCoy had access to the Defendant's medical records and reviewed the medical records, he may rely on those." *Id.* But the court clearly made that qualification when ruling on paragraph two of the State's motion, not paragraph six. Indeed, there was no discussion regarding the court's ruling on paragraph six, and the court simply stated, "Six granted as to any medical diagnosis he may have received from a doctor." *Id.* at 19. Contrary to the dissent's contention, when ruling on the specific issue of whether Dr. McCoy could testify about medical diagnoses, the trial court never gave Schmidt the impression that "had Dr. McCoy been called to testify he would have been permitted to testify with respect to an opinion based upon Dr. Pascuzzi's report, if in turn a proper foundation had been established for admission of that report." (Footnote omitted). Therefore, we cannot agree with the dissent's ultimate conclusion that "the trial court's exclusionary ruling as to Dr. McCoy was extended beyond what the trial court had actually said in its ruling upon the State's Motion in Limine."

* * *

Given the *Pirtle* court's concerns, we conclude that the purpose of the *Pirtle* doctrine is to ensure that no person in custody consents to an unlimited search unless she is fully informed of the constitutional rights she is waiving. The purpose of the doctrine is served by the requirement that a person in custody be advised that she may consult with an attorney before consenting to the unlimited search.

We note that the only four Indiana opinions in which our supreme court has applied the *Pirtle* doctrine have all addressed police searches of either dwellings or automobiles. Put another way, our supreme court has only applied *Pirtle* where, without the suspect's consent, the search in question was a general, unlimited search and would only have been reasonable with probable cause.

We now determine whether application of the *Pirtle* doctrine in the instant case serves the purpose of the doctrine. [Field sobriety tests] are qualitatively different from the general, unlimited searches that concerned the Pirtle court. [Field sobriety tests] are non-invasive and take little time to administer. More importantly, in our view, [field sobriety tests] are narrow in scope and are unlikely to reveal any incriminating evidence other than impairment. Because probable cause is not required to administer [such tests], the constitutional concerns expressed by the *Pirtle* court simply are not relevant. We conclude that it would not serve the purpose of the *Pirtle* doctrine to extend it to apply to field sobriety testing.

*Id.* at 980–82 (citations and footnote omitted, emphasis original in *Ackerman*).

Like field sobriety tests, chemical breath tests are "qualitatively different from the general, unlimited searches that concerned the *Pirtle* court." *Id.* at 981. While field sobriety tests reveal a suspect's general degree of impairment, chemical breath tests reveal only whether the suspect has alcohol in his system. Thus, chemical breath tests are narrower in scope and more specific than field sobriety tests. And although breath tests are more invasive than field sobriety tests, breath tests, like field sobriety tests, take little time to administer. The only significant difference between field sobriety tests and breath tests is that unlike field sobriety tests, breath tests require probable cause to administer. But we agree with the State that the *Pirtle* court's concerns with a suspect consenting to an unlimited search that would otherwise require probable cause are not an issue here.

In *Pirtle*, 323 N.E.2d at 639, the court stated:

> A search warrant may issue only upon probable cause supported by an affidavit particularly describing the place and property to be searched. Only a neutral magistrate may issue the warrant. It must include enough information to allow the magistrate himself to determine whether there is probable cause for a search. The information must be based on the officer's personal knowledge or on a credible tip from a reliable informer. *A person who consents to a search gives up all these protections and subjects himself to a general search without probable cause.*

(Citations omitted, emphasis added). Under Indiana's Implied Consent Statute, a law enforcement officer *who has probable cause* to believe that a person has committed one of the applicable driving offenses shall offer the person the opportunity to submit to a chemical test. *See* Ind.Code § 9–30–6–2(a). Accordingly, an officer cannot offer a breath test to a suspect, and the suspect cannot consent to or refuse the

test, until *after* the officer has probable cause to believe that a crime has occurred. Therefore, unlike the suspect in *Pirtle,* a suspect who is asked to submit to a chemical breath test does not subject himself to a general search without probable cause.

In sum, as in *Ackerman,* we conclude that the purpose of the *Pirtle* doctrine would not be served by extending that doctrine to apply to chemical breath testing. Thus, Officer Pitman was not required to advise Schmidt of his right to counsel before he asked him to submit to a chemical breath test, and the trial court did not abuse its discretion when it admitted evidence of Schmidt's refusal at trial.

### Issue Four: Prosecutorial Misconduct

Schmidt asserts that the prosecutor committed misconduct during closing argument. In particular, as he summarized Officer Pitman's observations of Schmidt's driving on the morning in question, the prosecutor commented, "That's the sole testimony you have as to his driving behavior." Transcript at 316. Schmidt claims that that statement was an improper reference to his Fifth Amendment right to remain silent and warrants reversal of his conviction. We cannot agree.

Our supreme court has held "that an appellate claim of prosecutorial misconduct presented on appeal in the absence of contemporaneous trial objection will not succeed unless the defendant establishes not only the grounds for prosecutorial misconduct but also the additional grounds for fundamental error." *Booher v. State,* 773 N.E.2d 814, 818 (Ind.2002). Here, Schmidt failed to object to the alleged misconduct at trial. Accordingly, he must meet the difficult burden of proving not only the grounds for prosecutorial misconduct, but also the additional grounds for fundamental error.

In reviewing a properly preserved claim of prosecutorial misconduct, we determine (1) whether the prosecutor engaged in misconduct, and if so, (2) whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he would not have been subjected. *Coleman v. State,* 750 N.E.2d 370, 374 (Ind.2001). The gravity of the peril turns on the probable persuasive effect of the misconduct on the jury's decision, not on the degree of impropriety of the conduct. *Ellison v. State,* 717 N.E.2d 211, 213 (Ind.Ct.App.1999), *trans. denied.* For prosecutorial misconduct to constitute fundamental error, it must " 'make a fair trial impossible or constitute clearly blatant violations of basic and elementary principles of due process [and] present an undeniable and substantial potential for harm.' " *Booher,* 773 N.E.2d at 817 (quoting *Benson v. State,* 762 N.E.2d 748, 756 (Ind.2002)).

It is misconduct for a prosecutor to request the jury to convict a defendant for any reason other than his guilt. *Wisehart v. State,* 693 N.E.2d 23, 59 (Ind. 1998), *cert. denied.* And although direct and indirect inferences from the defendant's failure to testify are not necessarily improper, a defendant's privilege against compulsory self-incrimination is violated when a prosecutor makes a statement that a jury may reasonably interpret as an invitation to draw an adverse inference from a defendant's silence. *Ben–Yisrayl v. State,* 690 N.E.2d 1141, 1149 (Ind.1997), *cert. denied.* The defendant bears the burden of proving that a remark by the prosecutor penalized his exercise of the right to remain silent. *Moore v. State,* 669 N.E.2d 733, 736 (Ind.1996) (citing *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965)).

Our supreme court has held that statements made by the State as to the

uncontradicted nature of the State's evidence do not violate a defendant's Fifth Amendment rights. *Martinez v. State,* 549 N.E.2d 1026, 1028 (Ind.1990). It is proper for the State to comment on the lack of evidence by the defense "as long as the State focuses on the absence of any evidence to contradict the State's evidence and not on the defendant's failure to testify." *Id.* Here, the prosecutor made no direct or indirect reference to Schmidt's decision not to testify. Rather, his statement that the officer's testimony regarding Schmidt's driving behavior was the "sole testimony" presented is a comment on the lack of any contradictory evidence presented by the defense. In other words, the prosecutor's statement is not one that a jury may reasonably interpret as an invitation to draw an adverse inference from a defendant's silence. *See Ben–Yisrayl,* 690 N.E.2d at 1149. Thus, Schmidt cannot meet his initial burden of proving that the prosecutor comment was improper.

 Even if the prosecutor's remark were improper, Schmidt cannot show that the misconduct, under all the circumstances, placed him in grave peril. First, the comment was isolated and constituted only one part of the entire closing argument. *Cf. Pennycuff v. State,* 727 N.E.2d 723, 733 (Ind.Ct.App.2000) (holding no fundamental error occurred despite repeated references to defendant's post-Miranda silence throughout trial), *rev'd on other grounds,* 745 N.E.2d 804 (Ind.2001). And Schmidt has not convinced us that the isolated comment had a probable persuasive effect on the jury's decision to find him guilty as charged. *See Ellison,* 717 N.E.2d at 213 (gravity of peril turns on the probable persuasive effect of misconduct on jury's decision, not on degree of impropriety of conduct).

Finally, Schmidt cannot demonstrate that fundamental error occurred. The mere fact that an alleged error implicates constitutional issues does not establish that fundamental error has occurred. *Wilson v. State,* 514 N.E.2d 282, 284 (Ind.1987). In *Benson v. State,* 762 N.E.2d 748, 755 (Ind.2002), our supreme court emphasized the "extremely narrow" applicability of the fundamental error doctrine:

> To qualify as fundamental error, an error must be so prejudicial to the rights of the defendant as to make a fair trial impossible. To be fundamental error, the error must constitute a blatant violation of basic principles, the harm or potential for harm must be substantial, and the resulting error must deny the defendant fundamental due process.

(Citations and quotations omitted); *see also Ford v. State,* 704 N.E.2d 457, 461 (Ind.1998) (stating that court views fundamental error exception to waiver rule as extremely narrow, available only when record reveals clearly blatant violations of basic and elementary principles and harm or potential harm cannot be denied). Under all of the circumstances, this case does not fall within the "extremely narrow" fundamental error exception because the prosecutor's isolated comment during closing argument does not constitute a clear and blatant violation of due process. Again, even if the remark were improper, we conclude that any alleged misconduct did not place Schmidt in grave peril, was not so blatant as to make a fair trial impossible, and, as such, did not constitute fundamental error.

### Issue Five: Admission of Evidence

 Schmidt's final argument on appeal is that the trial court abused its discretion when it allowed the State to ask Bennett questions about certain statistics regarding field sobriety test published in an NTHSA manual. Again, the admission or exclusion of evidence is a determination

entrusted to the discretion of the trial court. *Faulkner*, 663 N.E.2d at 800. We will reverse a trial court's decision only for an abuse of discretion, that is, only when the trial court's action is clearly erroneous and against the logic and effect of the facts and circumstances before it. *Id.*

During direct examination, the following colloquy occurred:

Q: What training have you had with regard to NTHSA as to whether or not certain portions of the population would be able to pass the one-legged stand when sober?

A: It's in each one of my manuals.

Q: What is the training in regard to that?

A: That 35 percent of sober persons would probably not pass that test.

Q: Okay. And with regard to the—and that's the one leg stand?

A: That is the one leg stand, yes, sir.

Q: And with regard to the walk and turn?

A: Thirty-two percent.

Transcript at 261. On cross-examination, the State clarified that the NHSTA manual Bennett referenced on direct did not actually report the 35% and 32% figures. Instead, the manual reported the percentages of people who are intoxicated who fail the field sobriety tests. The State then sought to further clarify that the manual did not use the terms "sober" or "intoxicated," but rather stated, for example, that 65% of people who fail the one-leg stand will have a blood alcohol content of .10 or more. Schmidt objected to the State's question, and the trial court overruled the objection as follows: "I think it's proper cross-examination based on his previous testimony[.]" *Id.* at 289.

A party may "open the door" to otherwise inadmissible evidence by presenting similar evidence that leaves the trier of fact with a false or misleading impression of the facts related. *Walker v. Cuppett*, 808 N.E.2d 85, 98 (Ind.Ct.App. 2004) (citing *Ortiz v. State*, 741 N.E.2d 1203, 1208 (Ind.2001) and *Williams v. State*, 733 N.E.2d 919, 926 n. 4 (Ind.2000) (parentheticals omitted)). Bennett's misleading testimony about the statistics contained within the NTHSA manual opened the door to the State's questions about the actual percentages published in the manual. Thus, we conclude that the trial court did not abuse its discretion when it admitted that testimony.

## CONCLUSION

Although the trial court erred when it instructed the jury that it could consider Schmidt's refusal to submit to a chemical breath test as evidence of intoxication, we conclude that that error was harmless. We further conclude that the *Pirtle* doctrine does not apply to chemical breath tests. The prosecutor's statement during closing argument was not improper, and the trial court did not abuse its discretion regarding any of the evidentiary rulings at issue on appeal.

Affirmed.

BARNES, J., concurs with separate opinion.

SULLIVAN, J., dissents with separate opinion.

BARNES, Judge, concurring.

I concur in the majority opinion in full, and write to acknowledge that I voted to concur in the *Luckhart* decision and its approval of an instruction similar to the one disapproved of in this case. At the time *Luckhart* was issued, our supreme court had not yet decided *Ludy*. Whatever the sequence, I am convinced that *Dill* and *Ludy* compel the result reached here and that my vote in *Luckhart* would not be the

same today, given the logic of the majority opinion and the combined effect of the *Ludy* and *Dill* decisions.

SULLIVAN, Judge, dissenting.

Although I concur with respect to the majority opinion's treatment of Issues One, Three, Four, and Five, I respectfully dissent with respect to Issue Two and would reverse the judgment and remand for a new trial.

The admissibility of Dr. McCoy's proffered testimony as to whether an ear condition suffered by Schmidt would have explained Schmidt's failure of the sobriety balance tests was not dependent upon what Schmidt may or may not have told Dr. McCoy. It was therefore not dependent upon whether Schmidt himself testified. Rather, a McCoy opinion in this regard might appropriately have been premised upon Defendant's Exhibit C, a medical record establishing that, as of December 2001, Schmidt had "a history of acute unilateral deafness and vertigo," rather than any statement from Schmidt as to his ear condition.[6]

In actuality, in making its preliminary exclusionary ruling, the trial court stated that opinion evidence with regard to a proffered opinion by Dr. McCoy would be permitted only if a hearing problem was a fact in evidence. The court stated that if Dr. McCoy "had access to the Defendant's

medical records and reviewed the medical records, he may rely on those." Tr. at 18. Thus, although the trial court granted the State's motion to exclude "any medical diagnosis [Schmidt] may have received from a doctor," Tr. at 19, the court indicated that Dr. McCoy could rely upon that medical record in forming his own opinion as to what effect, if any, that ear condition would have upon Schmidt's failure of the sobriety tests.

From this I would conclude that had Dr. McCoy been called to testify he would have been permitted to testify with respect to an opinion based upon Dr. Pascuzzi's report, if in turn a proper foundation had been established for admission of that report.[7] That conclusion, however, would appear to be misplaced in that the trial court later during the actual trial seemed to make its exclusionary ruling as to Dr. McCoy absolute.

Although the defense did include Dr. Pascuzzi's report in its offer to prove what Dr. McCoy's testimony would have been, Dr. McCoy was not called as a witness because as the following colloquy reflects the trial court was not going to permit Dr. McCoy's testimony:

"THE COURT: So this offer to prove is based on evidence that you feel Dr. McCoy would testify to but he was not called as a witness because of the Court's ruling on the Motion in Limine

---

6. Schmidt made an offer to prove Defendant's Exhibit C which consisted of one page of a report by Dr. Robert M. Pascuzzi of Wishard Hospital dated December 28, 2001, five months prior to Schmidt's arrest for the offense in question.

7. I respectfully disagree with the majority's determination that Dr. McCoy had insufficient expertise to evaluate the information in Dr. Pascuzzi's medical report and apply that information to the accuracy of the field sobriety tests. In this regard, I respectfully disagree with a portion of *Faulkner v. Markkay of*

*Indiana, Inc.*, 663 N.E.2d 798 (Ind.Ct.App. 1996) as quoted by the majority opinion here. As can be deduced from my separate opinion in that case, I took issue with the conclusion of the majority which stated that a doctor of chiropractic is unqualified to render an expert opinion based upon medical reports issued by physicians. *See id.* at 802 (Sullivan, J., concurring). Similarly, I disagree with my colleagues in this case that Dr. McCoy was *per se* unqualified to render an expert opinion based upon Dr. Pascuzzi's report.

would prevent his testimony. Is that right?

MR. COOK: That's correct, and he's available now. He lives in Carmel, he's got his cell phone on. He's indicated to me he would be available to testify if we needed him, but based upon the Court's ruling I indicated it probably wasn't likely, but I have an obligation to make a record which I'm doing as to what he relies on to testify he would do. He's been supplied the facts necessary to render an opinion and such.

THE COURT: After considering the offers to prove, *the Court does not wish to change its previous rulings.* If there is simply some evidence that the Defendant wishes to present, the defendant will have to testify, but the Defendant can't get in through other evidences and avoid testifying. It's just that's the way the rule is. Do you have any additional witnesses, Mr. Cook, or have you completed?

MR. COOK: We don't, Judge...." Tr. at 302 (emphasis supplied).

In my view, the trial court's exclusionary ruling as to Dr. McCoy was extended beyond what the trial court had actually said in its ruling upon the State's Motion in Limine. The in-trial exclusionary ruling clearly indicated that it would have been futile for defense counsel to attempt to lay a foundation for admission of Dr. Pascuzzi's report and to call Dr. McCoy as a witness.

Had Dr. McCoy been permitted to testify, it is quite possible that the jury would have virtually discredited the validity of the field sobriety balancing tests and perhaps reached a different result in its verdict.[8] For this reason I would reverse the judgment and remand for a new trial.

8. My dissent does not include a conclusion that exclusion of any opinion from Mr. Bennett with respect to Schmidt's ear condition would be cause for reversal. Although during direct examination of Mr. Bennett the possibility of an ear condition was obliquely mentioned, it was not pursued at the time. Subsequently, the offer to prove Exhibit C was made and appeared to be made with regard to Mr. Bennett's testimony. This can be explained, however, because Mr. Bennett was the only defense witness who was actually called to testify and it was logical chronologically to make the offer to prove in connection with his testimony. Nevertheless, it is clear that the thrust of the defense's position as to Schmidt's ear condition was with regard to Dr. McCoy's proffered opinion, not that of Mr. Bennett.