John **DATZEK**, Appellant–Defendant,

v.

**STATE** of Indiana, Appellee–Plaintiff.

No. 30A01–0503–CR–114.

Court of Appeals of Indiana.

Dec. 14, 2005.

Rehearing Denied Feb. 13, 2006.

---

John D. Fierek, Voyles Zahn Paul Hogan & Merriman, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Ellen H. Meilaender, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

SHARPNACK, Judge.

John Datzek appeals his conviction and sentence for operating a vehicle with a blood alcohol content greater than .08% but less than .15% as a class A misdemeanor.[1] Datzek raises five issues, which we consolidate and restate as:

I.    Whether the trial court abused its discretion by admitting Datzek's blood alcohol test results obtained from a blood draw following a traffic stop;

II.    Whether the evidence is sufficient to sustain Datzek's conviction for operating a vehicle with a blood alcohol content greater than .08% but less than .15%;

III.    Whether the trial court abused its discretion in sentencing Datzek.

We affirm.

The facts most favorable to the conviction follow.[2] On October 1, 2003, Greenfield Police Officer Michael Noble was on duty when he stopped at a Citgo gas station to get a drink. While inside, Officer Noble saw Datzek come inside the store and pay for some items. Officer Noble, who was standing four to six feet away from Datzek, noticed that Datzek had "poor balance[,]" "swayed a little bit[,]" and "was unsteady in his steps." Tran-

---

1.   Ind.Code § 9-30-5-1 (2004).

2.   Datzek did not include a copy of the chronological case summary in his Appellant's Appendix. We direct Datzek's attention to Ind. Appellate Rule 50(B)(1)(a), which provides that "[t]he appellant's Appendix in a Criminal Appeal shall contain ... copies of the following documents ... including the chronological case summary[.]"

script at 20, 22. Officer Noble also thought that he smelled alcohol coming from Datzek. Officer Noble asked a fellow officer whether he smelled alcohol on Datzek, and the officer responded that "he thought so, or that there may have been and he wasn't for sure." *Id.* at 22. After Datzek left the store, Officer Noble asked the cashier whether she had smelled alcohol on Datzek, and she stated that she was not sure.

Officer Noble left the store and watched Datzek as he drove away. Datzek turned from the Citgo parking lot onto the highway, but he did not use his turn signal. The highway was a four-lane highway with two eastbound lanes and two westbound lanes, and Datzek was traveling in the right lane of the two westbound lanes. After Officer Noble got into his car and followed Datzek on the highway, he noticed that Datzek's front and rear left tires "jerk[ed] across the left white dotted lane divider" into the left lane of the westbound traffic lanes for a few seconds. *Id.* at 30.

Officer Noble activated his emergency lights, initiated a traffic stop, and wrote Datzek a ticket for the infraction of failing to use his turn signal. After Officer Noble approached Datzek's car and asked for his license, Datzek exhibited manual dexterity problems as he tried to retrieve his license from its holder. As Officer Noble talked with Datzek, he smelled the odor of alcohol on Datzek's breath and saw that Datzek's eyes were bloodshot. Officer Noble administered three field sobriety tests to Datzek, and Datzek failed all three tests.

Officer Noble then read Indiana's implied consent law to Datzek, and Datzek agreed to submit to a chemical test. Officer Noble drove Datzek to Hancock Memorial Hospital for a blood draw. The

hospital was approximately three minutes away, and they were at the hospital for ten to fifteen minutes. The hospital report from Datzek's blood test revealed that Datzek had a serum blood alcohol content of .13%.[3]

The State charged Datzek with operating a vehicle while intoxicated as a class A misdemeanor and operating a vehicle with an alcohol concentration equivalent to at least .08 gram of alcohol but less than .15 gram of alcohol per 100 milliliters of the person's blood as a class C misdemeanor, both of which were enhanced to a class D felony because Datzek had a previous operating while intoxicated conviction within five years from these charged offenses. Datzek waived his right to a jury trial, and the State dismissed the operating a vehicle while intoxicated charge. Datzek moved to suppress the evidence obtained following the traffic stop.

The trial court held a combined suppression hearing and bench trial. During the bench trial, the State presented testimony from Jeffrey Retz, who had been working for the past twelve years as the scientific director of a hospital toxicology lab and had previously worked as the lab supervisor at the Indiana State Department of Toxicology for fifteen years. Retz testified that "[g]enerally serum alcohol content is approximately 15% higher than it would be if whole blood was analyzed" and converted Datzek's serum blood alcohol test results of .13% to a corresponding whole blood alcohol content of .11%. Transcript at 11–12. Datzek objected to the admission of his blood alcohol test results on the grounds that: (1) the traffic stop was illegal; (2) the blood draw was not the least intrusive means of testing available; and

---

**3.** We note that State's Exhibit A, the blood test results, are not contained in either the Appellant's Appendix or the Transcript.

(3) Datzek was not advised of his *Pirtle* rights before being asked to consent to the chemical test of his blood. The trial court overruled the objections and took the case under advisement.

The trial court found Datzek guilty of operating a vehicle with an alcohol concentration equivalent to at least .08 gram of alcohol but less than .15 gram of alcohol per 100 milliliters of the person's blood as a class C misdemeanor. Datzek stipulated that he had a prior operating while intoxicated conviction within five years from his current offense, which then enhanced his conviction to a class D felony.

The trial court sentenced Datzek under the alternate misdemeanor sentencing scheme and entered Datzek's sentence as a class A misdemeanor. The trial court sentenced Datzek to a 365–day sentence, with ninety days executed in a community corrections program and the other 275 days suspended, and ordered that he serve one year on probation. Thereafter, Datzek moved to stay the execution of his sentence pending appeal, and the trial court granted his motion.

### I.

■ The first issue is whether the trial court abused its discretion by admitting Datzek's blood alcohol test results obtained from the blood draw following the traffic stop. Because the admission and exclusion of evidence falls within the sound discretion of the trial court, we review the admission of evidence only for abuse of discretion. *Wilson v. State*, 765 N.E.2d 1265, 1272 (Ind.2002). An abuse of discretion occurs "where the decision is clearly

against the logic and effect of the facts and circumstances." *Smith v. State*, 754 N.E.2d 502, 504 (Ind.2001).

Datzek argues that, despite his consent to submit to a chemical test, the blood alcohol test results obtained from the blood draw were inadmissible because: (A) the traffic stop was illegal; (B) the blood draw was not the least intrusive means of chemical testing available; and (C) he was not advised of his *Pirtle* rights before being asked to consent to the chemical test of his blood. We will review each argument in turn.

#### A. *Traffic Stop*

■ Datzek argues that the traffic stop was illegal because Officer Noble had a mistaken belief that Datzek committed a traffic violation when he failed to use his turn signal when exiting the parking lot.[4] "It is well-settled that a police officer may briefly detain a person whom the officer believes has committed an infraction or an ordinance violation." *Peete v. State*, 678 N.E.2d 415, 419 (Ind.Ct.App.1997), *trans. denied.* *See also* Ind.Code § 34–28–5–3.

■ Here, Officer Noble testified that he observed Datzek make a right turn out of the parking lot and onto the highway without using his turn signal. Officer Noble initiated a traffic stop and wrote Datzek a ticket for the infraction of failing to use a turn signal under Ind.Code § 9–21–8–25. Ind.Code § 9–21–8–25 provides:

> A signal of intention to turn right or left shall be given continuously during not less than the last two hundred (200) feet traveled by a vehicle before turning or changing lanes. A vehicle traveling in a

---

4. Datzek also argues that the traffic stop was illegal because Officer Noble did not have reasonable suspicion to make the stop and because Officer Noble had a mistaken belief that Datzek committed a traffic infraction when he crossed the edge line markings from the right westbound lane into the left westbound lane. Because we conclude that Datzek's violation of the infraction for failing to use his turn signal when turning justified the stop, *see infra,* we will not address these other arguments.

speed zone of at least fifty (50) miles per hour shall give a signal continuously for not less than the last three hundred (300) feet traveled by the vehicle before turning or changing lanes.

A violation of this statute constitutes a class C infraction. *See* Ind.Code § 9–21–8–49.

Datzek did not signal before turning, and, thus, violated Ind.Code § 9–21–8–25. Datzek, however, contends that Ind.Code § 9–21–8–25 would not be applicable to him because it does not mention turning from a parking lot and because it would be impossible for him to use his turn signal for 200 feet before turning from the parking lot. Instead, Datzek contends that Ind.Code §§ 9–21–8–24[5] and 9–21–8–34[6] would apply to his turn from the parking lot and that he did not violate these statutes when he failed to use his turn signal when turning out of the parking lot.

■ We find Datzek's arguments unavailing. "Courts are obliged to respect the plain language of a statute" and when a statute is unambiguous, we must apply the plain and obvious meaning and not resort to other rules of construction. *Sholes v. Sholes,* 760 N.E.2d 156, 159 (Ind.2001). Ind.Code § 9–21–8–25 provides that "[a] signal of intention to turn right or left shall be given continuously during not less than the last two hundred (200) feet traveled by a vehicle before turning or changing lanes." Thus, the plain language of the statute requires that a vehicle must use a signal whenever it intends to turn or change lanes. There are no restrictions

that it only applies in certain situations or on certain roadways. *See State v. Dugan,* 793 N.E.2d 1034, 1036 (Ind.2003) (holding that it is just as important to recognize what the statute does not say as it is to recognize what it does say). Turn signals by a driver entering onto a highway provide other drivers on the highway, or preparing to enter from a position opposite and across the highway, with information of the signaling driver's intent. That information is important to the safety of the signaling driver, other drivers, and pedestrians. To limit the application of the statute as argued by Datzek would run counter to the terms of the statute and the policy to facilitate safe automobile traffic. Furthermore, the statute does not require that a person use his turn signal for 200 feet before turning in order for it to be applicable. Instead, it requires that a person use his turn signal for "not less than the last" 200 feet traveled. Ind.Code § 9–21–8–25. Therefore, Datzek's argument that Ind.Code § 9–21–8–25 would not be applicable to him is without merit. *See Sales v. State,* 723 N.E.2d 416, 420 (Ind. 2000) (holding that the legislature is presumed to have intended the language used in the statute to be applied logically and not to bring about an unjust or absurd result).

In addition, Datzek's argument that he did not violate Ind.Code §§ 9–21–8–24 and 9–21–8–34 is equally without merit. As we held in *Love v. State,* 741 N.E.2d 789, 791 (Ind.Ct.App.2001), a defendant's "argument regarding the legality of a traffic stop based on Indiana Code Section 9–21–

---

**5.** Ind.Code § 9–21–8–24 provides, in relevant part:

A person may not ... turn a vehicle from a direct course upon a highway ... unless the movement can be made with reasonable safety. Before making a movement described in this section, a person shall give ... an appropriate ... turn signal ... if any

other vehicle may be affected by the movement.

**6.** Ind.Code § 9–21–8–34 provides that "[a] person who drives a vehicle that is about to enter or cross a highway from a private road or driveway shall yield the right-of-way to all vehicles approaching on the highway."

8–24 ... [is] unavailing, given that the driver violated Indiana Code Section 9–21–8–25 by failing to activate his right turn signal before making a right turn." Here, Datzek violated Ind.Code § 9–21–8–25 by failing to use his turn signal when turning from the parking lot. Therefore, the traffic stop was justified, and the trial court did not abuse its discretion by admitting Datzek's blood alcohol test results obtained after the traffic stop. *See, e.g., Peck v. State,* 712 N.E.2d 951, 951–952 (Ind.1999) (reversing the Court of Appeals opinion, which held that, under the facts of the case, the defendant's failure to signal before turning did not violate Ind.Code § 9–21–8–24 and did not justify the traffic stop, and holding that the traffic stop of the defendant was justified because the defendant violated Ind.Code § 9–21–8–25 by failing to use a turn signal when turning); *State v. Geis,* 779 N.E.2d 1194, 1197 (Ind.Ct.App.2002) (rejecting the defendant's argument that the traffic stop was unjustified under Ind.Code § 9–21–8–24 and holding that the traffic stop of the defendant was justified because the defendant violated Ind.Code § 9–21–8–25 by failing to use his turn signal when changing lanes), *trans. denied; Love v. State,* 741 N.E.2d 789, 791–792 (Ind.Ct.App.2001) (holding that the defendant's reliance upon Ind.Code § 9–21–8–24 to support an argument that the traffic stop was illegal was unavailing given the fact that the defendant violated Ind.Code § 9–21–8–25 by failing to use a turn signal when turning).

### B. *Least Intrusive Means*

Datzek argues that the trial court abused its discretion by admitting his blood alcohol test results because the blood draw was not the least intrusive means of

chemical testing available. The Indiana Supreme Court has held that an "investigative detention [under *Terry*] must be temporary and last no longer than is necessary to effectuate the purpose of the stop" and "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Lockett v. State,* 747 N.E.2d 539, 541–542 (Ind.2001) (citations omitted), *reh'g denied.*

Here, Officer Noble initiated a traffic stop after he saw Datzek fail to use his turn signal when turning. After Officer Noble approached Datzek's car and asked for his license, Datzek exhibited manual dexterity problems as he tried to retrieve his license from its holder. As Officer Noble talked with Datzek, he smelled the odor of alcohol on Datzek's breath and saw that Datzek's eyes were bloodshot. Officer Noble administered three field sobriety tests to Datzek, and Datzek failed all three tests. Officer Noble then read Indiana's implied consent law to Datzek, and Datzek agreed to submit to a chemical test. Thereafter, Officer Noble drove Datzek to Hancock Memorial Hospital for a blood draw.

Datzek stipulated that there was probable cause for Officer Noble to offer him a chemical test. *See* Transcript at 43, 55. However, he argues that when a person consents to take a chemical test under Indiana's implied consent laws, the police officer should choose the "quickest" and "least intrusive" chemical test and that a blood draw should only be chosen if there is an injury that requires the officer to transport the person to the hospital.[7] Ap-

---

**7.** Datzek contends:

If a DataMaster machine is broken or a trip to the hospital is necessary for other purposes, then obviously a blood draw would

be appropriate. However, when a DataMaster machine is readily available and an extra trip to the hospital is not required, a breath test should be given as it is the least

pellant's Brief at 27. The State argues that "[t]he Fourth Amendment requirement that an officer use the least intrusive means to verify or dispel his suspicions during a *Terry* stop does not apply to the decision as to which chemical test to offer under the Implied Consent law." Appellee's Brief at 12. The State further contends that "[w]hen an officer has probable cause to believe a person is intoxicated and the person has consented to take each and every chemical test offered, the Constitution simply does not require an officer to choose one particular test over another." *Id.* at 14. We agree with the State.

■ "Indiana's implied consent statutes provide the State with a mechanism necessary to obtain evidence of a driver's intoxication in order to keep Indiana highways safe by removing the threat posed by the presence of drunk drivers." *Abney v. State,* 821 N.E.2d 375, 379 (Ind.2005). The implied consent statutes are aimed at providing law enforcement officers with implied consent for performing chemical tests on drivers who are thought to be intoxicated. *Brown v. State,* 744 N.E.2d 989, 993 (Ind.Ct.App.2001); *see also* Ind. Code § 9–30–6–2 (2004). A " '[c]hemical test' means an analysis of a person's blood, breath, urine, or other bodily substance for the determination of the presence of alcohol, a controlled substance, or a drug." Ind.Code § 9–13–2–22 (2004).

Ind.Code § 9–30–6–2 provides:

(a) A law enforcement officer who has probable cause to believe that a person has committed an offense under this chapter, IC 9–30–5 [operating a vehicle while intoxicated], or IC 9–30–9, or a violation under IC 9–30–15 shall offer the person the opportunity to submit to a chemical test.

(b) A law enforcement officer:

(1) is not required to offer a chemical test to an unconscious person; and

(2) may offer a person *more than one (1) chemical test* under this chapter.

(c) A test administered under this chapter must be administered within three (3) hours after the law enforcement officer had probable cause to believe the person committed an offense under IC 9–30–5 or a violation under IC 9–30–15.

(d) *A person must submit to each chemical test offered* by a law enforcement officer in order to comply with the implied consent provisions of this chapter.

(emphasis added). Furthermore, "[i]f a law enforcement officer has probable cause to believe that a person committed an offense under IC 9–30–5, the person may be arrested." Ind.Code § 9–30–6–3.

Thus, Indiana's implied consent law does not provide that police officers must use the "least intrusive" chemical test. *See* I.C. § 9–30–6–2. Indeed, the implied consent law allows an officer the ability to offer more than one chemical test and that the person who is asked to submit to a chemical test must submit to each test offered by an officer. *Id.* The implied consent law does not set limits on when a police officer may choose to offer a blood chemical test to a defendant. Furthermore, in order to offer a chemical test under the implied consent law, an officer must already have probable cause to believe that the person is intoxicated. *See* Ind.Code § 9–30–6–2(a).

■ Because Officer Noble already had probable cause to believe that Datzek had committed the criminal offense of driving while intoxicated when he offered Datzek a chemical test, Datzek's reliance on *Wilson*

intrusive means to investigate the suspects [sic] level of intoxication.

Appellant's Brief at 27.

*v. State,* 745 N.E.2d 789 (Ind.2001), is unavailing. In *Wilson,* the Indiana Supreme Court held that an officer is to use the least intrusive means necessary to investigate a traffic stop. *Wilson,* 745 N.E.2d at 791. The requirement that an officer use the least intrusive means of investigation during a *Terry* stop is necessary because the officer is making the stop without probable cause. *See Platt v. State,* 589 N.E.2d 222, 226 (Ind.1992) (noting that "the level of suspicion required for a *Terry* stop is less demanding than probable cause").

Here, however, Officer Noble initiated the traffic stop and investigated by administering field sobriety tests to Datzek, who then failed all of the tests. Thereafter, Officer Noble had probable cause to believe that Datzek was driving while intoxicated, which Datzek does not dispute, and offered Datzek the opportunity to submit to a chemical test. Datzek consented to the chemical test, and Officer Noble took Datzek to the hospital for a chemical blood test.

■ Therefore, we conclude that the Fourth Amendment requirement that an officer use the least intrusive means to verify suspicions during a *Terry* stop does not apply to his decision as to which chemical test to use under Indiana's implied consent law. *See, e.g., Fair v. State,* 627 N.E.2d 427, 433 (Ind.1993) (holding that "the Fourth Amendment does not necessarily require police to utilize the least intrusive means to secure and protect an automobile ... The question, then, is not whether there was absolute need to dispose of the vehicle but whether the decision to do so was reasonable"). *See also Illinois v. Lafayette,* 462 U.S. 640, 648, 103 S.Ct. 2605, 2610, 77 L.Ed.2d 65 (1983) (noting that "[t]he reasonableness of any particular governmental activity does not necessarily or invariably turn on the existence of alternative 'less intrusive' means").

■ Accordingly, the question is not whether Officer Noble's choice of a chemical blood test was the least intrusive but whether it was reasonable. Here, Datzek consented to submit to a chemical blood test, and he has not argued that the blood test was not within the scope of his consent. Furthermore, it took Officer Noble only about three minutes to drive Datzek to the hospital for the blood test, and they were at the hospital for ten to fifteen minutes. Thus, it was not unreasonable for Officer Noble to use a chemical blood test on Datzek where Indiana's implied consent laws give him an unrestricted choice of a blood, breath, or urine chemical test. To hold otherwise would require us to impose an unreasonable requirement on officers "to make fine and subtle distinctions" in deciding what type of chemical test to use under which type of situations. *See Lafayette,* 462 U.S. at 648, 103 S.Ct. at 2610 (noting that "[e]ven if less intrusive means existed of protecting some particular types of property, it would be unreasonable to expect police officers in the everyday course of business to make fine and subtle distinctions in deciding which containers or items may be searched and which must be sealed as a unit").

C.  *Pirtle Advisement*

Datzek argues that trial court abused its discretion by admitting his blood alcohol test results because he was not given a *Pirtle* advisement before being asked to consent to the chemical test of his blood. Specifically, Datzek argues that a blood draw is an unlimited search due to the nature of information that could possibly be obtained from an analysis of the blood and that he was entitled to be advised to his right to speak with counsel before submitting to a chemical blood test. The

State argues that a *Pirtle* advisement is not required prior to offering a chemical blood test under Indiana's implied consent law. We agree with the State.

▆▆▆▆▆ "Under the Indiana Constitution 'a person in custody must be informed of the right to consult with counsel about the possibility of consenting to search before a valid consent can be given.'" *Joyner v. State*, 736 N.E.2d 232, 241 (Ind. 2000) (quoting *Jones v. State*, 655 N.E.2d 49, 54 (Ind.1995), *reh'g denied;* citing *Pirtle v. State*, 263 Ind. 16, 28, 323 N.E.2d 634, 640 (1975)). In *Pirtle*, the Indiana Supreme Court held that "a person who is asked to give a consent to search while in police custody is entitled to the presence and advice of counsel prior to making the decision whether to give such consent." *Pirtle*, 263 Ind. at 28, 323 N.E.2d at 640.

> [T]he purpose of the *Pirtle* doctrine is to ensure that no person in custody consents to an unlimited search unless [ ]he is fully informed of the constitutional rights [ ]he is waiving. The purpose of the doctrine is served by the requirement that a person in custody be advised that [ ]he may consult with an attorney before consenting to the unlimited search.

*Ackerman v. State*, 774 N.E.2d 970, 981 (Ind.Ct.App.2002) (citing *Pirtle*, 263 Ind. at 28, 323 N.E.2d at 640), *reh'g denied, trans. denied.*

We have previously held that the purpose of the *Pirtle* doctrine would not be served by extending that doctrine to apply to field sobriety tests or chemical breath tests and that, therefore, a police officer is not required to advise a person in custody that he may consult with an attorney before administering field sobriety tests or a chemical breath test. *See Schmidt v. State*, 816 N.E.2d 925, 944 (Ind.Ct.App. 2004), *reh'g denied, trans. denied; Ackerman*, 774 N.E.2d at 982. In addition, we

have held that "a person who drives on Indiana's roads has no right to consult with an attorney prior to deciding whether or not to submit to a chemical test administered under the Implied Consent law[.]" *Dalton v. State*, 773 N.E.2d 332, 335 (Ind. Ct.App.2002), *trans. denied.*

In *Ackerman*, we held that police are not required to advise a person in custody that he may consult with an attorney before administering field sobriety tests and, thus, field sobriety tests are not governed by *Pirtle*. *Ackerman*, 774 N.E.2d at 982. We noted that the only four Indiana opinions in which the Indiana Supreme Court has applied the *Pirtle* doctrine have all addressed police searches of either dwellings or automobiles and that the Court "only applied *Pirtle* where, without the suspect's consent, the search in question was a general, unlimited search and would only have been reasonable with probable cause." *Id.* at 981. In holding that the police are not required to advise a person in custody that he may consult with an attorney before administering a field sobriety test, we reasoned that field sobriety tests "are qualitatively different from the general, unlimited searches that concerned the *Pirtle* court." *Id.* at 981. We further reasoned that field sobriety tests "are non-invasive[,] take little time to administer[,] are narrow in scope[,] and are unlikely to reveal any incriminating evidence other than impairment." *Id.* We also noted that the constitutional concerns expressed by the *Pirtle* court were not relevant because probable cause is not required to administer a field sobriety test. *Id.* at 981–982. Thus, we declined to extend the *Pirtle* doctrine to require the police to advise a person in custody that he may consult with an attorney before administering a field sobriety test. *Id.* at 982.

Similarly, in *Schmidt*, we held that police are not required to advise a person in

custody that he may consult with an attorney before offering a person a chemical breath test. *Schmidt*, 816 N.E.2d at 944. We reasoned that "[l]ike field sobriety tests, chemical breath tests are 'qualitatively different from the general, unlimited searches that concerned the *Pirtle* court.'" *Id.* at 943 (quoting *Ackerman*, 774 N.E.2d at 981). We noted that chemical breath tests "reveal only whether the suspect has alcohol in his system[,] are narrower in scope and more specific than field sobriety tests[, and] take little time to administer." *Id.* Additionally, we noted that the *Pirtle* court's concerns with a suspect consenting to an unlimited search that would otherwise require probable cause was not an issue. *Id.*

Under Indiana's Implied Consent Statute, a law enforcement officer who has probable cause to believe that a person has committed one of the applicable driving offenses shall offer the person the opportunity to submit to a chemical test. *See* Ind.Code § 9–30–6–2(a). Accordingly, an officer cannot offer a breath test to a suspect, and the suspect cannot consent to or refuse the test, until *after* the officer has probable cause to believe that a crime has occurred. Therefore, unlike the suspect in *Pirtle*, a suspect who is asked to submit to a chemical breath test does not subject himself to a general search without probable cause.

*Id.* at 943–944. Thus, we declined to extend the *Pirtle* doctrine to require the police to advise a person in custody that he may consult with an attorney before administering a chemical breath test. *Id.* at 944.

Like chemical breath tests, chemical blood tests are qualitatively different from the general, unlimited searches that concerned the *Pirtle* court. Chemical blood tests only reveal the presence of alcohol or drugs in a person's body and take little time to administer. Indeed, here, it took Officer Noble only about three minutes to drive Datzek to the hospital for the blood test, and they were at the hospital for ten to fifteen minutes, and Officer Noble testified that blood test results obtained from the hospital revealed only Datzek's blood alcohol level. Furthermore, consent to submit to a chemical blood test under Indiana's implied consent law is only consent to submit to an "analysis of a person's blood . . . for the determination of the presence of alcohol, a controlled substance, or a drug." Ind.Code § 9–13–2–22. *See also* Ind.Code § 9–30–6–2. In addition, like the chemical breath test, an officer cannot offer a chemical blood test to a suspect, and the suspect cannot consent to or refuse the test, until after the officer has probable cause to believe that the person has driven while intoxicated. *See* Ind. Code § 9–30–6–2(a). Here, Datzek stipulated that there was probable cause for Officer Noble to offer him a chemical test. *See* Transcript at 43, 55. Therefore, unlike the suspect in *Pirtle*, a suspect who is asked to submit to a chemical blood test does not subject himself to a general search without probable cause.

As in *Ackerman* and *Schmidt*, we conclude that the purpose of the *Pirtle* doctrine would not be served by extending that doctrine to apply to chemical blood testing. *See Schmidt*, 816 N.E.2d at 944; *Ackerman*, 774 N.E.2d at 982. Thus, Officer Noble was not required to advise Datzek of his right to counsel before he asked him to submit to a chemical blood test, and the trial court did not abuse its discretion when it admitted evidence of Datzek's blood test results. *See, e.g., Schmidt*, 816 N.E.2d at 944; *Ackerman*, 774 N.E.2d at 982. *See also Dalton*, 773 N.E.2d at 335.

## II.

The second issue is whether the evidence is sufficient to sustain Datzek's conviction for operating a vehicle with a blood alcohol content greater than .08% but less than .15%. When reviewing claims of insufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. *Jordan v. State*, 656 N.E.2d 816, 817 (Ind.1995), *reh'g denied.* Rather, we look to the evidence and the reasonable inferences therefrom that support the verdict. *Id.* We will affirm the conviction if there exists evidence of probative value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. *Id.*

The offense of operating a vehicle with a blood alcohol content greater than .08% but less than .15% is governed by Ind. Code § 9–30–5–1(a), which provides that "[a] person who operates a vehicle with an alcohol concentration equivalent to at least eight-hundredths (0.08) gram of alcohol but less than fifteen-hundredths (0.15) gram of alcohol per ... one hundred (100) milliliters of the person's blood ... commits a Class C misdemeanor."

To obtain a conviction under Ind.Code § 9–30–5–1, the State must prove the defendant's alcohol content in terms of weight of alcohol in the whole blood. *See Melton v. State*, 597 N.E.2d 359, 360–361 (Ind.Ct.App.1992), *trans. denied.* The alcohol content of whole blood is not the same as the alcohol content of either the plasma or serum portion of the blood.[8] *Newcomb v. State*, 758 N.E.2d 69, 71 (Ind.Ct.App.2001). Thus, "the results obtained from the testing of the other bodily substances must be converted into the weight of alcohol in the whole blood." *Melton*, 597 N.E.2d at 361. "Where a serum blood test has been taken of the defendant's blood, the State must present expert testimony concerning conversion of the serum test results into whole blood percentage by weight." *Mehidal v. State*, 623 N.E.2d 428, 432 (Ind.Ct.App.1993) (citing *Melton*, 597 N.E.2d at 359).

Datzek argues that the State failed to present reliable evidence regarding Datzek's whole blood alcohol concentration. In support of his argument, Datzek relies on *Newcomb v. State*, 758 N.E.2d 69 (Ind. Ct.App.2001). In *Newcomb*, we reversed the defendant's conviction for driving with a blood alcohol content of .10% because "the State presented no expert testimony ... converting the blood serum figures to whole BAC." *Newcomb*, 758 N.E.2d at 72. In *Newcomb*, the State presented testimony from a hospital "technical coordinator" for the hospital chemistry and blood bank departments, who testified that "according to literature" serum blood alcohol levels can be fifteen to twenty percent higher than the whole blood alcohol level but further testified that her figures were based on "speculations and assumptions." *Newcomb*, 758 N.E.2d at 72. The State did not present any evidence establishing the technologist's training and credentials or establishing that she was an expert qualified to render an opinion on a conversion. *Id.* We held that the evidence was insufficient to support the defendant's conviction because the State failed to present testimony establishing the technical coordinator as an expert qualified to testify regarding the defendant's blood alcohol content based on the results of a serum blood test. *Id.*

Unlike *Newcomb*, here, there was not a lack of evidence regarding Retz's training and credentials. Retz testified

---

8. "Blood plasma, obtained by centrifuging the blood, is whole blood minus the cells, while blood serum is whole blood with the clotting elements removed." *Newcomb v. State,* 758 N.E.2d 69, 71 (Ind.Ct.App.2001) (citations omitted).

that he had a bachelor's degree in chemistry, had been working for the past twelve years as the scientific director of a hospital toxicology lab, and, prior to that, had worked as the lab supervisor at the Indiana State Department of Toxicology for fifteen years. Retz also testified that he was a member of the Society of Forensic Toxicology and attended numerous conferences on toxicology. Retz testified that "[g]enerally serum alcohol content is approximately 15% higher than it would be if whole blood was analyzed" and converted Datzek's serum blood alcohol test results of .13% to a corresponding whole blood alcohol content of .11%. Transcript at 11–12. Furthermore, unlike *Newcomb* where the technologist testified that her conversion of the serum blood to whole blood was based on "speculations and assumptions," here, Retz testified that percentage that he used for the conversion was based on what he had learned from the literature in the field of toxicology and from other toxicologists at conferences. Thus, the State presented expert testimony concerning conversion of the serum test results into whole blood percentage by weight. Therefore, we conclude that the State presented sufficient evidence to show that Datzek operated a vehicle with a blood alcohol content greater than .08% but less than .15%. *See, e.g., Hayes v. State,* 514 N.E.2d 332, 338 (Ind.Ct.App.1987) (affirming the defendant's conviction where the State presented evidence of the defendant's serum blood alcohol content and evidence from a toxicologist who testified that the serum alcohol level is approximately twelve percent higher than the blood alcohol level and who converted this level into a corresponding blood alcohol content), *reh'g denied, trans. denied; Shuman v. State,* 489 N.E.2d 126, 129–130 (Ind.Ct. App.1986) (affirming the defendant's conviction and admission of the defendant's serum blood alcohol content where the State introduced expert witness testimony concerning conversion of the serum blood test results to a blood alcohol content level), *reh'g denied, trans. denied. Cf. Melton,* 597 N.E.2d at 361 (holding that a medical technologist's testimony regarding the defendant's alcohol content in his plasma blood without any conversion of that plasma test into the defendant's blood alcohol content by weight in his whole blood was insufficient to support the defendant's conviction for operating a vehicle with .10% or more because the State did not produce any evidence that would allow the factfinder to convert the result of the plasma test into an amount of alcohol by weight in the whole blood).

### III.

The third issue is whether the trial court abused its discretion in sentencing Datzek. Sentencing decisions rest within the discretion of the trial court and are reviewed on appeal only for an abuse of discretion. *Smallwood v. State,* 773 N.E.2d 259, 263 (Ind.2002). An abuse of discretion occurs if "the decision is clearly against the logic and effect of the facts and circumstances." *Pierce v. State,* 705 N.E.2d 173, 175 (Ind.1998).

The trial court found Datzek guilty of operating a vehicle with an alcohol concentration equivalent to at least .08 gram of alcohol but less than .15 gram of alcohol per 100 milliliters of the person's blood as a class C misdemeanor, which was enhanced to a class D felony because of Datzek's prior operating while intoxicated conviction within five years from his current offense. The trial court sentenced Datzek under the alternate misdemeanor sentencing scheme and entered Datzek's sentence as a class A misdemeanor. The trial court sentenced Datzek to a 365–day sentence, with ninety days executed in a community corrections program and the

other 275 days suspended, and ordered that he serve one year on probation.

Datzek argues that the trial court abused its discretion by sentencing him to a term of imprisonment and probation that, when combined, exceeded the one-year limit set forth in Ind.Code § 35–50–3–1(b). Ind.Code § 35–50–3–1 governs the suspension of a sentence for a misdemeanor conviction and provides:

(a) The court may suspend any part of a sentence for a misdemeanor.

(b) Except as provided in subsection (c), whenever the court suspends in whole or in part a sentence for a Class A, Class B, or Class C misdemeanor, it may place the person on probation under IC 35–38–2 for a fixed period of not more than one (1) year, notwithstanding the maximum term of imprisonment for the misdemeanor set forth in sections 2 through 4 of this chapter. However, the combined term of imprisonment and probation for a misdemeanor may not exceed one (1) year.

(c) Whenever the court suspends a sentence for a misdemeanor, if the court finds that the use or abuse of alcohol, drugs, or harmful substances is a contributing factor or a material element of the offense, the court may place the person on probation under IC 35–38–2 for a fixed period of not more than two (2) years. However, a court may not place a person on probation for a period of more than twelve (12) months in the absence of a report that substantiates the need for a period of probation that is longer than twelve (12) months for the purpose of completing a course of substance abuse treatment. A probation user's fee that exceeds fifty percent (50%) of the maximum probation user's fee allowed under IC 35–38–2–1 may not be required beyond the first twelve (12) months of probation.

Datzek correctly notes that, under Ind.Code § 35–50–3–1(b), the combined term of imprisonment and probation cannot exceed one year. *See, e.g., Smith v. State,* 621 N.E.2d 325, 326 (Ind.1993) (holding that "a combined term of probation and imprisonment exceeding one year is inconsistent with the maximum term for conviction for a misdemeanor"); *Beck v. State,* 790 N.E.2d 520, 522–523 (Ind.Ct. App.2003) (holding that the trial court erred by sentencing the defendant, who was convicted of a class A misdemeanor, to 365 days imprisonment with 351 days suspended and probation for 365 days because the sentence imposed a term of probation that caused the defendant to serve more than one year of combined imprisonment and probation). However, Datzek fails to take the "[e]xcept as provided in subsection (c)" language of Ind.Code § 35–50–3–1(b) into account.

Ind.Code § 35–50–3–1(c) allows the trial court to place a person on probation for a period of not more than two years if it suspends the sentence and "the use or abuse of alcohol, drugs, or harmful substances is a contributing factor or a material element of the offense." Here, Datzek was convicted of operating a vehicle with a blood alcohol content of greater than .08% but less than .15% as a class A misdemeanor, and the use of alcohol was a material element of the offense. Consequently, Ind.Code § 35–50–3–1(c) applies, and Ind. Code § 35–50–3–1(b), including the one-year maximum combined term of imprisonment and probation, is inapplicable. Thus, under Ind.Code § 35–50–3–1(c), the trial court was able to place Datzek on probation for a period of not more than two years. Therefore, the trial court did not abuse its discretion when it sentenced Dat-

zek, whose offense involved the use of alcohol, to a term of imprisonment of one year with ninety days executed and one year of probation. *See, e.g.,* Ind.Code § 35–50–3–1(c); *Smith,* 621 N.E.2d at 326 n. 2 (noting that Ind.Code § 35–50–3–1(c) "extends the maximum period of probation under suspended sentence for a misdemeanor only when the use or abuse of alcohol, drugs, or harmful substances is a contributing factor or material element of the offense").

For the foregoing reasons, we affirm Datzek's conviction and sentence for operating a vehicle with a blood alcohol content greater than .08% but less than .15% as a class A misdemeanor.

Affirmed.

DARDEN, J. and BAILEY, J. concur.