

FILED

Dec 29 2017, 11:27 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Ruth Ann Johnson
Indianapolis, Indiana

Rory Gallagher
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

George P. Sherman
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Monica Dycus, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | December 29, 2017 <br><br> Court of Appeals Case No. 49A05-1705-CR-978 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable David J. Certo, Judge <br><br> The Honorable David Hooper, Magistrate <br><br> Trial Court Cause No. 49G12-1601-CM-1053 |

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Defendant, Monica Dycus (Dycus), appeals her conviction for operating a vehicle while intoxicated endangering a person, a Class A misdemeanor, Ind. Code § 9-30-5-2(a).

We reverse and remand for a new trial.

# ISSUES

Dycus presents this court with two issues on appeal, which we restate as:

(1) Whether the trial court abused its discretion by admitting chain of custody forms from the Indiana State Department of Toxicology in violation of her Right to Confrontation under the United States Constitution; and

(2) Whether a person in custody must be advised of the right to counsel before being able to validly consent to a drug recognition exam.

# FACTS AND PROCEDURAL HISTORY

On January 8, 2016, El-Hadj Barry (Barry) noticed his ex-girlfriend, Dycus, following him when he was on his way to pick up a female friend from school. Barry pulled over and told Dycus to stop tailing him. Dycus did not respond and continued to follow Barry to the school. After picking up his friend, Barry decided to drive around for a while in an attempt to lose Dycus. However, Dycus "was shouting" at Barry "every time [he] came to a stop. She was tailgating." (Transcript p. 87). Barry observed Dycus swerving and if he

"accidentally would have made a quick stop, she would have hit [his] car." (Tr. p. 87). Barry's friend called 911.

[5] Indianapolis Metropolitan Police Department Officer Christopher Cooper (Officer Cooper) was dispatched to the area near 16th Street and Lafayette Road in response to the 911 call. When Officer Cooper arrived at the intersection, Barry and Dycus were stopped at a red light. Dycus' "driver's door was opened. [Dycus] ha[d] one foot on the pavement. The other foot was on the brake. And, she was leaning out of the car window yelling at the vehicle in front of her." (Tr. p. 103). Officer Cooper activated his emergency lights. Approaching Dycus' car, he requested her identification and instructed her to remain in the vehicle. After speaking with Barry and checking his information, Officer Cooper informed him that he was free to leave.

[6] Officer Cooper continued to detain Dycus because he believed she was driving on a suspended license. While speaking with her, the officer noticed the "odor of marijuana coming from her breath." (Tr. p. 107). Dycus told Officer Cooper that "there was nothing in her vehicle, [and] that her and her mom had smoked marijuana about an hour before." (Tr. p. 107). At that point, Officer Cooper radioed for backup, requesting for the help of Indianapolis Metropolitan Police Officer Christopher Winter (Officer Winter), who is certified to conduct a drug recognition evaluation (DRE). Upon arriving, Officer Winter asked Dycus to perform a field sobriety test. While conducting the field sobriety test, Officer Winter smelled "a strong odor of marijuana coming from her when she spoke. It was so strong that [the officers] thought that she had some hidden on her

somewhere." (Tr. p. 118). Dycus passed the horizontal gaze nystagmus test, which indicated that she was not under the influence of alcohol. She failed the walk-and-turn test and the one-legged stand test. Dycus consented to a certified breath test, which returned negative for the presence of alcohol. However, while performing the breath test at the IMPD Northwest office, Officer Winter observed a green, leafy substance in Dycus' mouth and "a green streak going down her tongue." (Tr. p. 130).

[7] Officer Winter advised Dycus that the signs that she was impaired were not consistent with the negative alcohol results and asked Dycus if she would submit to a DRE. A DRE is a standardized, 12-step program designed to determine whether an individual is impaired by the use of drugs based on the totality of the evaluation. Pursuant to the DRE guidelines, it is possible to infer the type of substance that caused the impairment by using a seven-category[1] evaluation matrix. During the exam, which also includes three behavioral tests, Officer Winter took Dycus' temperature with an oral thermometer, he measured her blood pressure, and examined her arms. He illuminated her nasal cavities with a flashlight to look inside. He ordered Dycus to open her mouth and examined the inside. Officer Winter measured Dycus' pupil size in three different lighting conditions. Some parts of the DRE took place in a pitch black room—in this case, a closet at IMPD's northwest office. Officer Winter entered

---

[1] These seven categories are: (1) central nervous system depressants, (2) central nervous system stimulants, (3) hallucinogens, (4) PCP, (5) inhalants, (6) cannabis, and (7) narcotic analgesics. (State's Exh. 8).

all the observations of Dycus' DRE into a "drug symptom matrix." *See* State's Exh. 8). At the conclusion of the thirty-minute DRE, Officer Winter concluded that Dycus was under the influence of marijuana.

[8] Dycus consented to a blood draw and was transported to Eskenazi hospital. A nurse at Eskenazi drew two vials of blood from Dycus and handed the blood samples to Officer Winter, who sealed them with evidence tape, signed his name, and transported the blood samples to the IMPD property room. According to the Indiana State Department of Toxicology Analysis Request Form, the blood samples were then received by Indianapolis Metropolitan Police Officer Michael Duke, who transported the vials to the Indiana State Department of Toxicology (ISDT) for testing. ISTD assigned an identifying number to the blood samples and the vials were subsequently shipped via FedEx to National Medical Services (NMS).

[9] NMS is an accredited laboratory, located in Pennsylvania. ISDT outsources some of its casework to NMS, including blood tests for marijuana. NMS lab support specialist Samantha Hill (Hill) prepared the blood sample for testing, and NMS forensic scientist Craig Leopold analyzed the sample, which tested positive for Delta-9 THC in the amount of 3.0 ng/ml. Delta-9 THC is an active metabolite of marijuana with psychoactive effects, and which "generally shows impairment at around a level of one nanogram per milliliter." (Tr. p. 227).

[10] On January 9, 2016, the State filed an Information, charging Dycus with Count I, operating a vehicle while intoxicated endangering a person, a Class A

misdemeanor. On October 27, 2016, the State amended the charging Information, adding Count II, operating a vehicle with a controlled schedule I or II substance or its metabolite in the person's body, a Class C misdemeanor. On March 16, 2017, the trial court conducted a jury trial. During the trial court proceedings, Dycus objected to the admission of the DRE, arguing that the officer should have given her a *Pirtle*[2] advisement prior to requesting her consent. Dycus also contended that the admission of the chain of custody forms and shipping documents for her blood samples violated her right to confrontation. The trial court overruled both objections. At the conclusion of the evidence, the jury found Dycus guilty as charged. At the sentencing hearing on April 19, 2017, the trial court vacated Count II and sentenced Dycus to 365 days on Count I, with 361 days suspended to probation.

[11] Dycus now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Standard of Review*

[12] Generally, "[a] trial court has broad discretion in ruling on the admissibility of evidence and we will disturb its rulings only where it is shown that the court abused that discretion." *Turner v. State*, 953 N.E.2d 1039, 1045 (Ind. 2011). A trial court abuses its discretion if its decision is clearly against the logic and

---

[2] *Pirtle v. State*, 323 N.E.2d 634 (Ind. 1975), stands for the proposition that the Indiana Constitution requires that a person in custody be informed of the right to consult with counsel prior to consenting to a search.

effect of the facts and circumstances before the court or if the court misapplies the law. *Mack v. State*, 23 N.E.3d 742, 750 (Ind. Ct. App. 2014), *trans. denied.* But where, as here, a constitutional violation is alleged, the proper standard of appellate review is *de novo*. *Speers v. State*, 999 N.E.2d 850, 852 (Ind. 2013), *cert. denied*, 134 S.Ct. 2299 (2014).

## II.  *Admission of Chain of Custody Exhibits*

[13] As an issue of first impression, Dycus contends that the trial court violated her Sixth Amendment Right to Confrontation by admitting formal documents from the ISDT to establish a detailed chain of custody without presenting live testimony.  Maintaining that these documents contain extrajudicial statements about the chain of custody of Dycus' blood sample, Dycus asserts that the documents must be susceptible to cross-examination.  While recognizing that the State was not required to admit those forms, as omissions in the chain of custody go towards weight, Dycus argues that once the state moved to admit a strict and detailed chain of custody, live testimony was required to preserve her Right to Confrontation under the United States Constitution.

[14] The Confrontation Clause of the Sixth Amendment provides in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. CONST. AMEND. VI.  "[T]his bedrock procedural guarantee applies to both federal and state prosecutions."  *Crawford v. Washington*, 541 U.S. 36, 42, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).  In *Crawford*, the United States Supreme Court held that the

Confrontation Clause guarantees a defendant the right to confront all of those who bear testimony against him. *Id*. at 51. Testimonial statements are "inadmissible unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination." *Id*. at 54. A statement is testimonial when "[a] solemn declaration or affirmation [is] made for the purpose of establishing or proving some fact," and this "core class of testimonial statements" includes: (1) "ex parte in-court testimony or its functional equivalent;" (2) "extrajudicial statements contained in formalized testimonial materials;" (3) "statements made under circumstances that would lead an objective witness to reasonably believe that the statement would be available for use at a later trial;" and (4) "statements taken by police officers in the course of interrogation." *Id*. at 51-52.

[15] Five years after *Crawford* was decided, the Supreme Court considered the Confrontation Clause implications of admitting sworn certificates of forensic analysts. In *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 309, 129 S.Ct. 2527, 174 L.Ed. 2d 314 (2009), the trial court allowed certified lab reports indicating the weight and identity of cocaine to be admitted into evidence. *Id*. The defendant was convicted and his convictions were affirmed by the state appeals court. *Id*. The Supreme Court, by a 5-4 vote, vacated the defendant's conviction, with the majority determining that the "certificates of analysis" were "incontrovertibly a solemn declaration or affirmation made for the purpose of establishing or proving some fact," and thus were testimonial in nature. *Id*. at 310. The Court observed that certificates of analysis were

functionally identical to live in-court testimony, doing "precisely what a witness does on direct examination," and that the analysts who authored them were witnesses for Sixth Amendment purposes. *Id*. at 310-11. The Court, citing its decision in *Crawford*, held that "[a]bsent a showing that the analysts were unavailable to testify at trial *and* that petitioner had a prior opportunity to cross-examine them, petitioner was entitled to be confronted with the analysts at trial." *Id*. (emphasis in original).

[16] The Court was careful, however, to reject the notion that the prosecution must call everyone whose identity is relevant in establishing the chain of custody, the authenticity of the sample, or the accuracy of the testing device used to perform the analysis. The *Melendez-Diaz* Court stated:

> [W]e do not hold, and it is not the case, that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case. While the dissent is correct that "[i]t is the obligation of the prosecution to establish the chain of custody, . . ." this does not mean that everyone who laid hands on the evidence must be called. As stated in the dissent's own quotation, . . . "gaps in the chain [of custody] normally go to the weight of the evidence rather than its admissibility." It is up to the prosecution to decide what steps in the chain of custody are so crucial as to require evidence; but what testimony *is* introduced must (if the defendant objects) be introduced live. Additionally, documents prepared in the regular course of equipment maintenance may well qualify as nontestimonial records.

*Id*. at 311, n.1.

[17] The Supreme Court once again addressed the scope of the Confrontation Clause in *Bullcoming v. New Mexico*, 564 U.S. 647, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011). In *Bullcoming*, the defendant was charged with driving under the influence, and at trial, objected to the prosecution's attempt to admit a blood content analysis report through the testimony of an analyst who did not perform or observe the defendant's blood test. *Id*. at 651. Instead of calling the analyst who signed and certified the forensic report, the prosecution called another analyst who had not performed or observed the actual analysis, but was familiar with the general testing procedures of the laboratory. *Id*. The *Bullcoming* Court declined to accept this surrogate testimony, despite the fact that the testifying analyst was a "knowledgeable representative of the laboratory" who could "explain the lab's processes and the details of the report." *Id*. at 673. The Court stated simply: "[t]he accused's right is to be confronted with the analyst who made the certification." *Id*. at 652.

[18] Just as in *Melendez-Diaz*, the forensic report that was "introduce[d]" in *Bullcoming* "contain[ed] a testimonial certification, made in order to prove a fact at a criminal trial." *Id*. at 658. Specifically, the report was introduced at trial for the substantive purpose of proving the truth of the matter asserted by its out-of-court author—namely, that the defendant had a blood-alcohol level of 0.21. *Id*. This was the central fact in question at the defendant's trial, and it was dispositive of his guilt. *See id*. at 664. The Court emphasized that the forensic laboratory report at issue did more than merely report a "machine-generated number;" the report verified that the lab had received the blood sample intact

with the seal unbroken, that the testing analyst performed a particular test in accordance with a specific protocol, and that nothing affected the integrity of the sample or the validity of the analysis. *Id*. at 659. In concurrence, Justice Sotomayor highlighted the narrow scope of the majority's decision and reaffirmed the proposition that not all of those in the chain of custody are required to provide live testimony. *Id*. at 670. In so doing, Justice Sotomayor cited the relevant language of *Melendez-Diaz*, stating: "[Not] every person noted on [the lab] report must testify." *Id* at 670 n.2.

[19] Most recently, in *Speers v. State*, 999 N.E.2d 850, 855 (Ind. 2013), *cert. denied*, 134 S.Ct. 2299 (2014), the sole analyst who conducted the DNA testing and prepared the laboratory reports that were introduced as exhibits testified as to the results of the testing at trial. However, Speers complained that the prosecution had violated his confrontation rights because the technician who removed the blood sample from a piece of glass to a swab for testing—but did not perform any testing—did not testify at trial. *Id*. Relying on *Melendez-Diaz* and *Bullcoming*, our Indiana supreme court concluded that "there is no Confrontation Clause violation where the State introduces evidence and links in the chain of custody of that evidence are missing. *Id*. at 855. "Indeed, 'the State need not establish a perfect chain of custody, and any gaps go to the weight of the evidence and not its admissibility.'" *Id*. (citing *Kennedy v. State*, 578 N.E.2d 633, 639 (Ind. 1991)).

[20] Turning to the case at hand, Dycus objected to the State's Exhibits 9 through 12, as being testimonial statements admitted in violation of her Right to

Confrontation. Asserting that the primary purpose of the documents was to identify, describe, and vouch for the reliability of the evidence during the proceedings, Dycus maintained that the Exhibits constituted "formalized extrajudicial statements created for the purpose of prosecution[.]" (Appellant's Br. p. 19). Exhibit 9 is the ISDT's analysis request form, listing Dycus' name and identifying characteristics, the charge, the submitting agency, and Dycus' case number # 16-00359. It includes a specific section on evidence collection and chain of custody information, identifying the analyst and task. The form does not include any test results. Exhibit 10 is the ISDT case chain of custody report for case # 16-00359 and describes twenty separate transfers of Dycus' blood sample over a period of nine months. It specifies the dates, times, and purposes for which these transfers were made, as well as the person/location sending the sample and the person/location receiving the sample. Exhibits 11 and 12 are ISTD's shipping manifests, representing that sample # 16-00359 was shipped via FedEx, and containing the signatures of the persons sending and receiving the sample.

[21] We find Dycus' claim that her Confrontation Right was violated to be unpersuasive. Dycus' argument contradicts the plain language of *Melendez-Diaz*, which provides that not every individual who "laid hands" on the evidence need to testify to satisfy the Confrontation Clause; rather, only when the statement sought to be introduced is testimonial in nature live testimony is required. *Melendez-Diaz*, 557 U.S. at 311 n.1. In analyzing whether a statement is testimonial and therefore subject to the protections of the Confrontation

Clause under *Crawford*, we apply the "primary purpose test," in which "we objectively evaluate the circumstances in which the encounter occurs and the statements and actions of the parties." *Michigan v. Bryant*, 562 U.S. 344, 359, 131 S.Ct. 1143, 1156, 179 L.Ed. 93 (2011). Here, the primary purpose of the creation and maintenance of State's Exhibits 9 through 12 was to document the evidence and attempt to accurately account for the samples as they were transferred from IMPD's northwest office to ISTD and ultimately to NMS. These chain of evidence forms were not created for the sole purpose of providing evidence against the defendant. In fact, none of these Exhibits include test results or any evidence that would aid in the prosecution's burden of establishing Dycus' guilt.

[22] Moreover, *Melendez-Diaz* and the other cases relied upon by Dycus are factually distinguishable from the case at bar. *Melendez-Diaz* and *Bullcoming* all addressed situations in which a forensic report was admitted to prove evidentiary facts at issue other than, or in addition to, the chain of custody. It was on those separate ground that the plaintiffs' Confrontation Clause challenges focused. Here, the testing and certifying analyst testified and was subject to cross-examination. The analyst explained in detail the process used to test Dycus' blood and testified to the results of the analysis at trial, where the defense was provided a full opportunity to cross-examine her. Accordingly, as the State's Exhibits 9 through 11 were not testimonial or created for the purpose of prosecuting Dycus, Dycus' rights under the Confrontation Clause were not violated.

Next, Dycus argues that the trial court abused its discretion by admitting the results of the DRE because she was not given a *Pirtle* advisement before conducting the thirty-minute evaluation. Likening the DRE to an unlimited search which was quasi-medical in nature, Dycus maintains that she was entitled to be advised of her right to speak with counsel prior to submitting to the test. In response, the State maintains that because the DRE was not very intrusive and is only likely to reveal the presence of drugs, no *Pirtle* warning was necessary.

Under the Indiana Constitution "'a person in custody must be informed of the right to consult with counsel about the possibility of consenting to a search before a valid consent can be given.'" *Joyner v. State*, 736 N.E.2d 232, 241 (Ind. 2000) (citing *Pirtle v. State*, 323 N.E.2d 634, 640 (1975)). In *Pirtle*, the Indiana Supreme Court held that "a person who is asked to give consent to search while in police custody is entitled to the presence and advice of counsel prior to making the decision whether to give such consent." *Pirtle*, 323 N.E.2d at 640.

> [T]he purpose of the *Pirtle* doctrine is to ensure that no person in custody consents to an unlimited search unless []he is fully informed of the constitutional rights []he is waiving. The purpose of the doctrine is served by the requirement that a person in custody be advised that []he may consult with an attorney before consenting to the unlimited search.

*Ackerman v. State*, 774 N.E.2d 970, 981 (Ind. Ct. App. 2002) (*citing Pirtle*, 323 N.E.2d at 640), *reh'g denied, trans. denied*. This right is unique to Indiana and

has no parallel under the Federal Constitution. *See United States v. LaGrone*, 43 F.3d 332, 337 (7th Cir. 1994) ("A person in custody has no federal constitutional right to consult with an attorney before consenting to a search of his property. However, the Indiana [C]onsitution does afford such a right."). And, where a defendant's rights under *Pirtle* have been violated, the fruits of the search are not admissible in court. *See Brown v. State*, 653 N.E.2d 77, 80 (Ind. 1995).

[25] We have previously held that the purpose of the *Pirtle* doctrine would not be served by extending that doctrine to apply to field sobriety tests or chemical breath tests and that, therefore, a police officer is not required to advise a person in custody that he may consult with an attorney before administering field sobriety tests or a chemical breath test. *See Schmidt v. State*, 816 N.E.2d 925, 944 (Ind. Ct. App. 2004), *reh'g denied, trans. denied*; *Ackerman*, 774 N.E.2d at 982. In addition, we have held that "a person who drives on Indiana's roads has no right to consult with an attorney prior to deciding whether or not to submit to a chemical test under the Implied Consent Law." *Dalton v. State*, 773 N.E.2d 332, 335 (Ind. Ct. App. 2002), *trans. denied; Datzek v. State,* 838 N.E.2d 1149 (Ind. Ct. App. 2005), *reh'g denied, trans. denied*. Most recently, our supreme court declared that a buccal swab for DNA gathering purposes does not require a *Pirtle* advisement. *Garcia-Torres v. State*, 949 N.E.2d 1229 (Ind. 2011).

[26] In *Ackerman*, we held that police officers are not required to advise a person in custody that he may consult with an attorney before administering field sobriety tests and, thus, field sobriety tests are not governed by *Pirtle*. *Ackerman*, 774

N.E.2d at 982. We noted that the only four Indiana opinions in which the Indiana Supreme Court has applied the *Pirtle* doctrine have all addressed police searches of either dwellings or automobiles and that the Court "only applied *Pirtle* where, without the suspect's consent, the search in question was a general, unlimited search and would only have been reasonable with probable cause." *Id*. at 981. Accordingly, we concluded that field sobriety tests "are qualitatively different from the general, unlimited searches that concerned the *Pirtle* court." *Id*. at 981. We further reasoned that field sobriety tests "are non-invasive[,] take little time to administer[,] are narrow in scope[,] and are unlikely to reveal any incriminating evidence other than impairment." *Id*. Thus, we declined to extent the *Pirtle* doctrine to require the police to advise a person in custody that he may consult with an attorney before administering a field sobriety test. *Id*. at 982.

[27] Similarly, in *Schmidt*, we held that police are not required to advise a person in custody that he may consult with an attorney before offering a person a chemical breath test. *Schmidt*, 816 N.E.2d at 944. We reasoned that "[l]ike field sobriety tests, chemical breath tests are 'qualitatively different from the general, unlimited searches that concerned the *Pirtle* court.'" *Id*. at 943 (quoting *Ackerman*, 774 N.E.2d at 981). We noted that chemical breath tests "reveal only whether the suspect has alcohol in his system[,] are narrower in scope and more specific than field sobriety tests[, and] take little time to administer." *Id*.

[28] We extended this analysis to chemical blood tests in *Datzek*. *See Datzek*, 838 N.E.2d at 1160. "Like chemical breath tests, chemical blood tests are

qualitatively different from general unlimited searches that concerned the *Pirtle* court." *Id*. Chemical blood tests only reveal the presence of alcohol or drugs in a person's body and take little time to administer. *See id*. "Furthermore, consent to submit to a chemical blood test under Indiana's implied consent law is only consent to submit to an 'analysis of a person's blood . . . for the determination of the presence of alcohol, a controlled substance, or a drug.'" *Id.; see* I.C. § 9-13-2-22. Therefore, we concluded that "unlike the suspect in *Pirtle*, a suspect who is asked to submit to a chemical blood tests does not subject himself to a general search without probable cause." *Id*.

[29]   Lastly, in *Garcia-Torres*, our supreme court declared that "*Pirtle* and the ensuing cases have applied this rule only to the weightiest intrusions." *Garcia-Torres*, 949 N.E.2d at 1238. However, "the intrusion here is slight. The swabbing [for DNA] caused no discomfort, and *Garcia-Torres* has virtually no legitimate interest in concealing his identity following his lawful arrest." *Id*. at 1239. Comparing fingerprinting with a buccal swab, the court noted that "[t]his Court has long held that the police are allowed to take fingerprints and other identifying physical information from those lawfully arrested."[3] *Id*. Accordingly, our supreme court opined that a *Pirtle* advisement is not required for a buccal swap. *See id*.

---

[3] Our Supreme Court appeared to find it important that "two witnesses testified at length about how the samples taken from Garcia-Torres were used. There is no evidence in the record that the DNA from Garcia-Torres's swab was or will be used for any purpose other than comparing it to the samples in the rape kit and from the shoe." *Id*. at 1236.

[30]   As is clear from *Pirtle* and its progeny, our case law declines to apply the *Pirtle* doctrine to intrusions that are "slight" and not very "serious," instead seemingly reserving its application to searches of homes and vehicles. *Id*. at 1238-39. However, the Indiana Constitution makes no such distinction, protecting Hoosiers against "unreasonable searches" of "their persons as well as their "houses, papers, and effect."[4] *See* Article I, Section 11 Indiana Constitution. Accordingly, a person maintains a reasonable expectation of privacy in that person's body and body cavities. *See Smith v. State*, 744 N.E.2d 437, 439 (Ind. 2001) (acknowledging a legitimate expectation of privacy in body and blood samples). When courts have permitted DNA searches or other bodily intrusions, they have done so on the basis that the search is minimally intrusive or a statutory exception was present.

[31]   Lacking a statutory exception as in the case of chemical blood tests, the main question becomes whether the DRE can be characterized as a limited search, only amounting to a slight intrusion into an individual's privacy. We conclude that it cannot. Unlike a blood test which only takes "three minutes" and a field sobriety test, which takes "little time to administer," the DRE in the instant case took thirty minutes to conduct. *See Datzek*, 838 N.E.2d at 1159, 1160. Whereas the chemical blood draw and field sobriety tests are qualitatively

---

[4] The same is true under the Federal Constitution. As Justice Brennan expressed in writing for the majority in *Schmerber v. California*, 384 U.S. 757, 770, 86 S.Ct. 1826, 16 L.Ed. 2d 908 (1966), "Search warrants are ordinarily required for searches of dwellings, and, absent an emergency, no less could be required where intrusions into the human body are concerned."

limited, a DRE is all-encompassing and amounts to a quasi-medical examination. The evaluation not only includes the field sobriety tests, but also involves a detailed search of an individual's body. The thoroughness of the search, including shining a flashlight up a person's nose, inserting a thermometer into an individual's mouth, inspecting the arms, and placing the suspect in a pitch black closet for the sole purpose to measure the reaction of the person's pupil in various lighting conditions are, when taken together, invasive and expansive in scope, and resemble a general search. It provides police officers not only with possible incriminating evidence, but also with information about a person's general health. Most importantly, unlike the pass-fail character of the other tests, the result of the DRE battery of tests must be analyzed through a drug symptom matrix, which requires a police officer's subjective assessment of the outcome and which "might be colored by [his] primary involvement in the often competitive enterprise of ferreting out crime." *See Terry v. Ohio*, 392 U.S. 1, 12, 88 S.Ct. 1868, 20 L.Ed. 889 (1968). Because the DRE is akin to an unlimited search that the *Pirtle* doctrine is designed to protect against, we hold that a person in custody must be advised of his right to consult with an attorney prior to consenting to a DRE. As Dycus was not given the *Pirtle* advisement, her consent was invalid as a matter of law and the evidence obtained thereby was inadmissible.

[32]     The State now contends that even though Dycus was not informed of her right to consult with counsel, the evidence is admissible because the error was harmless. Errors in the admission of evidence are to be disregarded as harmless

unless they affect the substantial rights of a party. *Sparkman v. State*, 722 N.E.2d 1259, 1263 (Ind. Ct. App. 2000). In determining whether error in the introduction of evidence affected a defendant's substantial rights, we must assess the probable impact of the improperly admitted evidence upon the jury. *Id*. When there is substantial independent evidence of guilt such that it is unlikely that the erroneously admitted evidence played a role in the conviction or where the offending evidence is merely cumulative of other properly admitted evidence, the substantial rights of the party have not been affected, and we deem the error harmless. *Smith v. State*, 839 N.E.2d 780, 784 (Ind. Ct. App. 2005).

[33] Excluding the DRE test and its subsequent result, leaves the State with the testimony of Officer Cooper who noticed the smell of marijuana emanating from Dycus and who testified to Dycus' admission that she and her mom had smoked marijuana an hour prior to her driving her vehicle. Officer Cooper conducted a field sobriety test, which was inconclusive and Officer Winter observed a green streak going down Dycus' tongue. It is undeniable that the positive results of the DRE and the subsequent blood test had a powerful impact on the jury's verdict. Therefore, we find it doubtful whether the jury would have reached a similar result in the absence of the improperly admitted evidence. As the admission of the evidence was not harmless, we reverse the verdict and remand for a new trial.

# CONCLUSION

Based on the foregoing, we hold that the admission of ISTD's chain-of-custody forms were not subject to the protection of the Confrontation Clause of the United States Constitution under the circumstances before us. However, we reverse and remand for a new trial because a person in custody must be advised of the right to counsel before being able to validly consent to a DRE.

We reverse and remand for a new trial.

Robb, J. and Pyle, J. concur