## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 30 2018, 10:47 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jennifer L. Koethe
La Porte, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Jesse R. Drum
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Justin M. Lower,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

July 30, 2018

Court of Appeals Case No.
46A03-1610-CR-2430

Appeal from the La Porte Circuit Court

The Honorable Thomas J. Alevizos, Judge

Trial Court Cause No.
46C01-1409-MR-257

**Pyle, Judge.**

# Statement of the Case

Justin Lower ("Lower") appeals his conviction by jury of murder[1] as well as his adjudication as an habitual offender.[2] He argues that: (1) the trial court committed reversible error by admitting a photo array into evidence; (2) the trial court abused its discretion in admonishing the jury; and (3) the prosecutor engaged in misconduct amounting to fundamental error during closing argument. Finding no reversible error, no abuse of the trial court's discretion, and no fundamental error, we affirm Lower's murder conviction.

We affirm.

# Issues

1. Whether the trial court committed reversible error in admitting the photo array into evidence.

2. Whether the trial court abused its discretion in admonishing the jury.

3. Whether the prosecutor committed misconduct amounting to fundamental error during closing argument.

---

[1] IND. CODE § 35-42-1-1.

[2] IND. CODE § 35-50-2-8.

## Facts

[3] In August 2014, Lower, armed with two knives, went to a LaPorte bar with Stephanie McKenna ("McKenna"). At some point, McKenna left the bar but told Lower she would return later. While McKenna was gone, Lower sent her the following text message:

> When u comein? How long? WTF? You left me here by myself
> I feel like fifhting someone, I don't want go to prison but I have
> no one to vibe with. I need you here.

(Exhibits Vol. 6 at 162) (misspelled words and improper grammar in the original). When McKenna texted Lower that she would return shortly, he responded:

> Im bout to fight so I hope not too long, I wanna beat someones
> face in!!!

(Exhibits Vol. 6 at 162) (misspelled words and improper grammar in the original).

[4] Shortly after McKenna returned to the bar, she and Lower walked outside to the parking lot where a group of men were fighting. Brian Hoops ("Hoops") had just knocked Rob Wisniewski ("Wisniewski") through a storefront window. Hoops then hit a friend, Tyrone Hicks ("Hicks"). As Damien Peak ("Peak") attempted to separate Hoops and Hicks, Lower approached the group and yelled to Hoops, "Fuck those niggas, we got 'em, let's do this, fuck them." (Tr. Vol. 4 at 238). Peak told Lower that the altercation between the two

friends "was none of his business." (Tr. Vol. 3 at 144). Lower initially turned away but then approached Peak from behind.

[5] Marcus Phelps ("Phelps"), who had just walked in the parking lot, warned Peak about Lower's approach, and Lower and Phelps began to fight. During the altercation, Lower stabbed Phelps nine times, twisting the knife several times as he pulled it out of Phelps' body. Lower then went inside the bar to the bathroom to wash Phelps' blood off of his arms and hands before leaving with McKenna. Phelps died as a result of the stab wounds.

[6] The State charged Lower with murder and with being an habitual offender. At trial, LaPorte Police Department Officer Robert Allen ("Officer Allen") testified that he had interviewed Ryan Dodds ("Dodds") at the police station several hours after the murder and that Dodds had identified Lower in a photo array. When the State moved to admit the photo array into evidence, Lower objected that Lower's photo "show[ed] him in jail garb." (Tr. Vol. 4 at 11). Lower further objected to the admission of this evidence because "his identi[t]y was not an issue" at trial. (Tr. Vol 4 at 12). After Officer Allen explained that the Lower's photograph was taken the day he was arrested "for this case," the trial court overruled Lower's objection and admitted the photo array into evidence. (Tr. Vol. 4 at 13).

[7] Detective Brett Airy ("Detective Airy") testified that he had watched a surveillance video from a bank across the street from the bar's parking lot in an attempt to see whether Lower or Phelps had initiated their altercation.

However, according to Detective Airy, the bank's surveillance camera was too far from the parking lot to clearly record what had happened. During cross-examination, defense counsel asked Detective Airy if he had attempted "either through ISP or anyone else to have that video enhanced." (Tr. Vol. 4 at 155). Detective Airy responded that, in the past, he had "tried [to] have videos enhanced that were much better quality than that, and [he] had never had any luck being able to enhance video footage." (Tr. Vol. 4 at 155).

[8] Also at trial, when defense counsel asked Peak if he had told Hicks that "[Phelps] went to grab [Lower], and then they started fighting," Peak responded that he had not. (Tr. Vol. 3 at 175). When defense counsel asked Peak if he had seen "who was the aggressor, who was the defender," Peak again responded that he had not. (Tr. Vol 3 at 125). Peak specifically testified as follows:

> I didn't hear any words, just the scuffling. You know what I mean? There was nothing being said. So, hearing that of course, knowing he was behind me at one point, I look over my shoulder, and at this point, there's an altercation going on, and I can't make out what's going on or who it is. In my mind, it didn't really have nothing to do with me, so just as I spoke with him, it's none of my business. I didn't pay it no attention, I really didn't.

(Tr. Vol. 3 at 152).

[9] During the presentation of his evidence, Lower admitted that he had stabbed Phelps nine times. However, he further explained that Phelps had knocked him

to the ground and hit and kicked him several times before Lower stabbed Phelps in self-defense.

[10] Also during his presentation of evidence, Lower advised the trial court that he wanted to call Hicks as a witness to impeach Peak's testimony that he had not seen who had started the fight between Lower and Phelps. Outside the presence of the jury, Lower proffered Hicks' testimony that the day after the fight, Peak told him that Phelps "went to grab [Lower] . . . and then they started fighting." (Tr. Vol. 4 at 246). During the proffer, the State objected that Hicks' testimony was hearsay. Defense counsel responded that the "offer [was] for impeachment purposes only" and had "zero probative value in substantive evidence." (Tr. Vol 4 at 241, 244-45). He further suggested that the trial court could admonish the jury that the testimony was "only for the purpose of impeachment, and [could] not be used for substantive evidence." (Tr. Vol. 4 at 243).

[11] Hicks subsequently testified that Peak told him that "[Phelps] went to grab [Lower], and they started fighting." (Tr. Vol. 5 at 5). During cross-examination, Hicks testified that Peak "didn't really say that he witnessed it, but he told me." (Tr. Vol. 5 at 6). The trial court then admonished the jury as follows:

> Alright. This is important. This is a limiting instruction. What you've heard in Mr. Peak's question and answer . . . cannot be used as evidence of what was stated in the statement. You cannot use it as such. In fact, Mr. Peak did not have any first-hand knowledge of that fact, however, you may use that question

and answer for the reason it was given, and that was to impeach Mr. Peak's credibility. . . . You can't use it for the truth of what was said in the statement, but simply to impeach his credibility.

(Tr. Vol. 5 at 6). Lower objected to the trial court telling the jury that "Mr. Peak did not have any firsthand knowledge of that fact."

[12] Also at trial during closing argument, defense counsel argued as follows:

[I]t would have been wonderful to see bank security surveillance. And I can understand if that camera just isn't good enough. It happens. But when the State has the burden to disprove self-defense, don't you think they owe it to you as the trier of fact to at least try and get the video enhanced? What you heard was, 'I checked with another detective some time in the past. That video wasn't – wasn't able to be enhanced, so I didn't bother doing it this time." It's unacceptable in this matter of higher importance. You deserve more. Justin deserves more. Don't think for a second, if a detective, if an agency, if the prosecutor's office – wanted to show this was self-defense? Don't think for a second they would not have pursued that and pursued that end. Just as they pursued the end of a murder conviction.

(Tr. Vol. 5 at 41-42).

[13] On rebuttal, the prosecutor responded as follows without objection:

They have the same discovery the State did. They have the same video. They have the same interviews. Everything. They have the same stuff we do. . . . So, if there are certain videos, the capability exist[s] to both of us. No, Detective Airy told you. The incapability of that bank video. He described for you how bad it was. So was it unreasonable to believe that it was not going to be enhanceable?

(Tr. Vol. 5 at 47).

The jury convicted Lower of murder and adjudicated him to be an habitual offender. The trial court sentenced Lower to 72 years, 60 years for murder, enhanced by 12 years for being an habitual offender. Lower now appeals his murder conviction.

# Decision

## 1. Admission of Evidence

Lower first argues that the trial court abused its discretion when it admitted the photo array into evidence. He appears to contend that the photo array was not relevant because Lowers' identity was not at issue and that it was prejudicial because "all individuals pictured in the line-up were in jail garb and [the photograph] could lead a reasonable jury to believe that he had a prior criminal record." (Lower's Br. 20).

We review the trial court's ruling on the admission of evidence for an abuse of discretion. *Dycus v. State*, 90 N.E.3d 1215, 1219-20 (Ind. Ct. App. 2017). A trial court abuses its discretion if its decision is clearly against the logic and effect of the facts and circumstances before the court. *Id.* at 1220. However, even if the trial court abuses its discretion in admitting evidence, a reversal may be obtained "only if the record as a whole discloses that the erroneously admitted evidence was likely to have had a prejudicial impact upon the mind of the average juror, thereby contributing to the verdict." *Wales v. State*, 768 N.E.2d 513, 521 (Ind. Ct. App. 2002), *trans. denied*.

[17] Mug shots are ordinarily not admissible in evidence because they tend to reveal to the jury that the accused has a criminal record. *Coleman v. State,* 546 N.E.2d 827, 831 (Ind. 1989). However, "there is no jeopardy in showing a photograph of appellant" taken at the time of his arrest on the current charges before the trial court. *Id. See also Wheeler v. State*, 749 N.E.2d 1111, 1114 (Ind. 2001) (concluding that mug shots of the defendant were not unfairly prejudicial because a detective told the jury that the photographs were taken the day of his arrest for the current charges). Here, where Officer Allen testified that Lower's photograph was taken at the time of Lower's arrest on the current charges, the photograph was not likely to have had a prejudicial impact upon the mind of the average jury or contributed to the verdict. The trial court did not commit reversible error in admitting the photo array into evidence.

## 2. Jury Admonishment

[18] Lower also argues that the trial court abused its discretion when it admonished the jury that "Peak did not have any first-hand knowledge of that fact." Lower specifically argues as follows:

> The Court stated that Mr. Peak did not have any first-hand knowledge of that fact, but that the jury could use the statement to impeach Mr. Peak's credibility. Trans. 503. It should have been up to the jury to determine whether Mr. Peak had knowledge of that fact through his testimony or other witness testimony. As a result, the admonishment from the Court was misleading to the jury, clearly against the logic and effect of the facts and circumstances and this case should be reversed and remanded back to the trial court for an abuse of discretion.

(Lower's Br. at 22).

[19] However, Lower has waived appellate review of this argument because his brief, conclusory argument is supported neither by citation to authority nor cogent argument. *See Smith v. State*, 822 N.E.2d 193, 202-03 (Ind. Ct. App. 2005) ("Generally, a party waives any issue raised on appeal where the party fails to develop a cogent argument or provide adequate citation to authority and portions of the record."), *trans. denied*.

[20] Waiver notwithstanding, we find no error. Our review of the evidence reveals that Peak specifically testified that he did not see or know who the initial aggressor was in the fight between Phelps and Lower. This evidence supports the trial court's admonishment that Peak did not have first-hand knowledge of that fact. The trial court did not improperly admonish the jury, and we find no abuse of the trial court's discretion.

### 3. Prosecutorial Misconduct

[21] Lastly, Lower argues that the prosecutor "committed misconduct by arguing in her [rebuttal] closing argument that Mr. Lower could have had a video tape enhanced." (Lower's Br. at 22). Assuming that Lower properly objected to this closing argument, he has waived appellate review of this issue because he failed to request an admonishment or mistrial. *See Dumas v. State*, 803 N.E.2d 1113, 1117 (Ind. 2004) (explaining that a prosecutorial misconduct argument is waived when the defendant objected but did not request an admonishment or move for a mistrial).

Because Lower has waived this argument, he must establish not only the grounds for prosecutorial misconduct but also that the prosecutorial misconduct constituted fundamental error. *See Ryan v. State*, 9 N.E.3d 663, 667-68 (Ind. 2014). Fundamental error is an extremely narrow exception to the waiver rule where the defendant faces the heavy burden of showing that the alleged error is so prejudicial to the defendant's rights as to "make a fair trial impossible." *Id.* at 668.

Here, our review of the evidence reveals that the State's comment, made during its rebuttal closing argument, that Lower could have had the video tape enhanced was merely a response to Lower's closing argument comment that the State should have pursued enhancement of a parking lot surveillance video. "Prosecutors are entitled to respond to allegations and inferences raised by the defense even if the prosecutor's response would otherwise be objectionable." *Id.* at 669. As such, the prosecutor's comment in this case, which was a response to Lower's allegations and inferences, was neither improper nor did it amount to fundamental error.

Affirmed.

Kirsch, J., and Bailey, J., concur.